976 P.2d 390

**Frances L. HILL, Plaintiff–Appellant,**

v.

**Kerry K. INOUYE, Defendant–Appellee.**

No. 21253.

Supreme Court of Hawai'i.

Dec. 14, 1998.

Reconsideration Granted in Part and Opinion Amended Jan. 13, 1999.

Stephen T. Hioki, on the briefs, Honolulu, for plaintiff-appellant.

Keith S. Agena (Michael K. Tanigawa and Howard K. K. Luke with him on the brief) Honolulu, for defendant-appellee.

MOON, C.J., KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

Opinion of the Court by RAMIL, J.

Plaintiff–Appellant Frances L. Hill appeals from the family court's order, dated December 8, 1997, dissolving the temporary restraining order (TRO) for protection from Defendant–Appellee Kerry K. Inouye and denying Hill's motion for a permanent protective order. Hill argues that the family court incorrectly applied Hawai'i Revised Statutes (HRS) § 586–4 (Supp.1997), which requires a showing of recent acts of abuse. Hill, instead, argues that the family court should have applied HRS § 586–3 (Supp. 1997), which does not require a showing of recent acts of abuse. Inouye counters that the family court correctly interpreted and applied HRS § 586–4 and correctly required Hill to show recent acts of abuse.

Because the family court incorrectly interpreted HRS § 586–3 (Supp. 1997), the applicable statute in this case, and because the family court required Hill to show recent acts of abuse, we vacate the family court's order and remand the matter for a new hearing in accordance with HRS § 586-3 (Supp. 1997) and in accordance with this opinion.

## I. BACKGROUND

Hill was a patrol officer with the Honolulu Police Department and Inouye was her supervisor when they started to date romantically in August 1995. Hill moved in with Inouye one month later. Within two weeks of living together, according to Hill, Inouye began to display violent behavior. Inouye's behavior continued, and Hill finally moved out of the apartment on January 27, 1997.

Although Hill moved out and Inouye began a new relationship, Hill and Inouye continued dating romantically.

On November 4, 1997, Hill visited Inouye's new girlfriend to talk about Inouye. Inouye became angry and threatened Hill that, if she spoke with his girlfriend again, Hill would have to "face the consequences." Interpreting this as a threat, on November 20, 1997, Hill filed for and was granted a TRO for protection. An order to show cause (OSC) hearing was held on December 8, 1997.[1]

At the OSC hearing, Hill asked the family court for an extended three-year protective order against her ex-boyfriend, Inouye. Inouye opposed the motion and asked for mutual restraining orders. The transcript of the OSC hearing provides the following exchange:

> Mr. Luke: [T]he last date of the alleged threat to which we vehemently object was in March or April of 1996, which would be—your Honor, almost two years ago—two years and nine—excuse me, one year and nine months ago.
>
> The Court: Well—well—
>
> Mr. Luke: So—
>
> The Court: —*this Court's constitutionally bound to make a finding of current event first by statute—although they did not allege a recent act. I must find a recent act. And even without that, I think constitutionally for this Court to make such—these rulings, I need to find—unless the parties stipulate. In this case I need not make that finding.*
>
> But you are correct though, recent acts are essential for—
>
> Mr. Luke: That's correct.
>
> The Court: —the Court to grant restraining orders—
>
> Mr. Luke: Appreciate that, your Honor.
>
> The Court: — *regardless of what was happening earlier where they passed a statute saying that petitioner need not show a recent act. I still think I— constitutionally have to show a recent act as a finding.* Otherwise, I can't curtail basic civil rights of shelter, home, communication, money, loved ones—
>
> Mr. Luke: Right.
>
> The Court: —based upon an old allegation. Okay. In any case, we still have stip.
>
> Mr. Hioki: And—
>
> Mr. Luke: Can I have one—one moment please, your Honor? I'm sorry.
>
> (Mr. Luke and client conferring).
>
> (Mr. Hioki and client conferring).
>
> Mr. Luke: Your Honor, I apologize. Your Honor, I—I'm going to have to ask the Court to—that we have a contested hearing as far as the restraining order. I'd like to examine the Petitioner.
>
> The Court: Very well.
>
> (Inaudible) . . . . I'm looking at my time here.
>
> Mr. Luke: I'm sorry for that, your Honor.
>
> The Court: All right.
>
> I gave you twenty minutes a piece.
>
> Mr. Luke: Okay.
>
> The Court: Okay.
>
> Please be seated.
>
> Mr. Luke: Thank you.
>
> The Court: Thank you.
>
> Mr. Hioki, you may proceed. Your twenty minutes commences at this time.
>
> Mr. Hioki: Yes, your Honor. Will this be by way of offer of proof, your Honor?
>
> The Court: You can do it any way you want. Go ahead.
>
> Mr. Hioki: Okay. Because we only have twenty minutes, your Honor, I'd like to proceed by offer of proof.
>
> The Court: Proceed.
>
> Mr. Hioki: I'd like the Court to know that the burden of proof is actually on the Respondent under Chapter—

---

1. HRS § 586-5 (Supp.1997) provides in pertinent part:

   **Period of order; hearing.** (a) A temporary restraining order granted pursuant to this chapter shall remain in effect at the discretion of the court, for a period not to exceed ninety days from the date the order is granted.

   (b) On the earliest date that the business of the court will permit, but *no later than fifteen days from the date the temporary restraining order is granted,* the court shall, after giving due notice to all parties, hold a hearing on the application requiring *cause to be shown why the order should not continue.*

The Court: Yes. By statute.

Mr. Hioki: —586.

The Court: By constitution though clearly your—your client had the burden of proof.

Mr. Hioki: I'm—I'm willing to proceed, your Honor.

The Court: Go ahead.

Mr. Hioki: Your Honor, as an offer of proof I'll—I'll present the following facts for the court;

The Petitioner, Frances Hill, if called to testify would indicate that she's presently employed with the Honolulu Police Department, City and County of Honolulu, State of Hawaii.

She has been employed—so employed for a total number of six years.

Her first term of employment was 1989 to the end of 1991. And she was employed with the police department as a police officer in the patrol division.

She then was re-employed from the time period of November 14th, 1994 to the present time. Again, also as a police officer with the Honolulu Police Department in the patrol division.

She's—began working with the Respondent, Sergeant Inouye in approximately July of 1995, at that time the Respondent was Ms. Hill's supervisor. In particular, he was a Sergeant, she was a patrol officer.

He maintained the supervisory position from July of 1995 until November 1995. They began socializing together in August of 1995. And the Petitioner moved in with the Respondent in September 1995 after they began a—a romantic or intimate relationship.

She eventually moved out January 27th, 1997.

The relationship from the period of September 1995 to January 27th, 1997 was as follows;

Within two weeks of moving [in] together the Respondent demonstrated a violent temper. This would include yelling at the Petitioner, swearing at her, punching and kicking the walls as to leave indentations in the walls, flipping over his dinner plates and spill food on the table, stomping food into the carpet—for example, potato chips. And also destroying her personal effects, such as her son's photograph by crumpling it and throwing it out.

He also destroyed a pair of sunglasses that he had earlier given to her as a gift.

The reasons for such demonstrations of—of temper included times when the Petitioner would be late in making appointment with him, the shoes were not lined up neatly enough for him, she would forget clothes in the washing machine, she wouldn't put away magazines, she would forget to run an errand. And other similar—what she would testify to be minor mistakes, would—would send him into a—to be very upset and angry.

During this time period, he would literally throw her out of the apartment they were living in. Throw her clothes and belongings out on the sidewalk and lawn.

After these arguments, he would then call her up and act as if nothing had happened and they'd get back together again.

Two months after she moved in with the Respondent, the Respondent started to threaten to kill himself with his firearm.

The discussions or arguments concerning using a firearm to cause bodily harm escalated to April of 1996 where— approximately April of 1996 when during an argument the Respondent placed his service pistol to Ms. Hill's head and threatened to shoot her.

He then later took the gun away from her head and put the gun to his own head and threatened to kill himself.

Ms. Hill in past instances where the Petitioner—or strike that—where the Respondent threatened to kill himself, would talk him out of killing himself. And this would eventually calm him down.

The threat—strike that.

The Petitioner, Ms. Hill, felt dependent upon the Respondent during this

time period. She felt isolated from other persons. She could only socialize with other persons if he was present and they were only his friends.

If the Petitioner mentioned that she had any male friends or worked with any of the male officers, the—the Defendant would—would get upset and an argument would ensue.

Some of the instances of mistrust by the Respondent of the Petitioner included him interrogating her about where she was coming and going, why, any—strike that.

He would interrogate her on the exact minutes that she would be on an errand or—or at work. He would constantly page her even while she was at work. The pages would come as frequent as within one or two minutes of each other.

At home when they were living together, he'd even hit the redial button to see who she may have called on—on their telephone.

In approximately October 1996, Plaintiff started to get depressed. By December 1996 she decided to leave and moved out January 27th, 1997.

She presently resides at 1323 Kinau Street, apartment number 2, City and County of Honolulu, State of Hawaii.

When she moved out, the Petitioner was afraid to tell the Defendant. Eventually Defendant called her and they agreed to continue dating.

If called to testify, the Petitioner would say that she was dating because in certain respects she still cared for him, in other respects she was very much afraid of him and was trying to negotiate a—a common ground regarding the relationship.

The—the next incident occurred on March 26, 1997, approximately two months after moving out. At that time the Petitioner and the Defendant were to go out bicycle riding. Petitioner called the Respondent, indicating that she—she may have to work over time. He got very upset.

While on duty he went to her residence and started to remove both bicycles that had been stored there. He did it in such a way that to the Petitioner it was as though he was exhibiting the same temper and same anger that he would in other previous instances.

He removed the bicycles in such a way that it damaged and marked up the walls of the apartment as well as knocking over other belongings throughout the—throughout her apartment.

The Petitioner asked the Respondent to leave. He—he refused. She then called—and she indicated she would call the emergency number, 911. He in—he told her go ahead. So, she called. An officer showed up and—and thereafter the Respondent left.

In another instance, a Lieutenant Ballard was called in—November 15th, 1997 in response to the Petitioner's concerns of how the Defendant was acting. And an investigation was to be started.

At that time, present at the Petitioner's residence were Lieutenant Ballard and an Officer April Daniels, both of whom are present, your Honor.

The Respondent showed up at the house—the—the Petitioner's house after he had been told by his lieutenant not to see the Petitioner, ostensibly returned some of her belongings and left after Officer Daniels had confronted him.

In approximately November 5th, 1997—strike that. November 4th, 1997, the Respondent told the Petitioner not to contact his new girlfriend, an Officer Kellum.

Officer Kellum not only works in the police department but also rents a house from the Respondent.

The Respondent told the Plaintiff not to speak to Officer Kellum or to—or that she would have to face the consequences. And upon her questioning he would not be more specific.

During a conversation November 5th, 1997 a Officer Corrine Rivera was present with the Petitioner speaking—and they were both speaking to Officer Kellum, who related to—to them that the

Respondent would threaten to kill himself or threaten to increase the rent or threaten to throw out Officer Kellum from the apartment whenever the two of them would argue.

Throughout the incidents, your Honor, the Petitioner did not consent to being threatened, did not consent to the damage to her apartment, did not consent to have firearm placed on her head in—in April of 1996.

That during that time her observations of the Respondent was that he appeared to be very serious. He appeared to be very angry and virtually out of control of himself.

She's requesting that the orders issued earlier by the Court continue for a period of three years. That the Respondent be required to stay away from the Petitioner even during work hours.

And—and we're asking that his firearms be surrendered subject to Hawaii Revised Statute, section 134–79(f), unless he is specifically on duty.

And that the Court order a psychological evaluation as well as counseling as required by the evaluation until clinically discharged.

The Court: Okay. Mr. Hioki, I do want to ask you a question.

Mr. Hioki: Yes.

The Court: *Were there any threats of any extreme psychological abuse or malicious property damage in the months of October and November. And if so, what are those instances—1997?*

Mr. Hioki: Your Honor, I can have the Petitioner testify herself.

The Court: Okay. She may testify. Go ahead then.

Ms. Hill: When I spoke to him on November 4th when he told me that if I spoke to his present girlfriend that I would face the consequences. And I asked him what he meant by "consequences". And he says, well, if you do it you'll find out.

And I asked him was he threatening me—at this time we were on the telephone. And there was silence on the telephone. And I said—told him, well, I'll take your silence as a confirmation then that you're threatening me.

And I guess I took that to mean that either he's going to do something to me physically or maybe something to my property—based on his past behavior.

The Court: *Any other threats or psychological abuse that you can point to in the months of October and November 1997?*

Ms. Hill: I do—what exactly do you mean? Things that he did to me or—

The Court: Yes.

Ms. Hill: I guess accusations of seeing other people, ridiculing me, sometimes—

The Court: I'm sorry?

Ms. Hill: —follow me—ridiculing me, calls me—calling me names.

Mr. Hioki: Can you be more specific?

Ms. Hill: I guess he'd call me stupid a lot. And—and if he—when he lost his temper he would call me a bitch.

The Court: Thank you.

. . . .

The Court: This Court has heard the witness's testimony regarding the request for restraining order. *This Court is duty bound under the Statute to make a determination if there is a recent act as relative to November 20, 1997, the application date of physical harm, injury or assault or that there was a threat of physical harm, injury, assault or if there was malicious damage to property or if there's extreme psychological abuse.*[2]

Court is unable to make that determination in this case and the Court will deny this petition.

---

**2.** The family court's order dissolving the TRO for protection, filed on December 8, 1997, stated that the TRO was dissolved and vacated because of *"no findings of recent abuse or threat."* Although the court looked to *recent* acts or threats of physical harm, injury, assault, or malicious damage to property, or extreme psychological abuse, there is no indication that the court looked to other evidence pursuant to HRS § 586–3.

This Court stands in recess.

(Emphases and brackets added.)

## II. *STANDARD OF REVIEW*

■ The interpretation of a statute is a question of law reviewed *de novo*, under the right/wrong standard. *See State v. Davia,* 87 Hawai'i 249, 254, 953 P.2d 1347, 1352 (1998) (citing *State v. Arceo,* 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996)). "Under the right/wrong standard, we examine the facts and answer the question without being required to give any weight to the trial court's answer to it." *State v. Timoteo,* 87 Hawai'i 108, 113, 952 P.2d 865, 870 (1997) (quoting *State v. Naeole,* 80 Hawai'i 419, 422, 910 P.2d 732, 735 (1996) (citations omitted)).

We have previously held that the "family court possesses wide discretion in making its decisions and those decisions will not be set aside unless there is a manifest abuse of discretion." *In re Jane Doe,* 77 Hawai'i 109, 115, 883 P.2d 30, 36 (1994) (citing *Fujikane v. Fujikane,* 61 Haw. 352, 355, 604 P.2d 43, 45 (1979)). "Under the abuse of discretion standard of review, the family court's decision will not be disturbed unless the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant[, and its] decision clearly exceed[ed] the bounds of reason." *Doe,* 77 Hawai'i at 115, 883 P.2d at 36 (internal quotation marks and citation omitted).

*In the Interest of Jane Doe, Born May 22, 1976,* 84 Hawai'i 41, 46, 928 P.2d 883, 888 (1996) (brackets in original).

## III. *DISCUSSION*

Hill claims the family court erred because the family court (1) applied the wrong statute in denying Hill's petition for a protective order, and, therefore, (2) improperly required Hill to show "recent" acts of abuse to extend the·order.

Inouye disagrees and argues that (1) Hill waived her objection to the family court's application and interpretation of the specific statute by failing to raise the issue in the court below, and (2) the family court correctly applied and interpreted the statute requiring a finding of "recent" acts of abuse. Our

primary discussion, therefore, is one of statutory construction.

### A. *Preservation of Issue*

■ A preliminary question that needs answering is whether Hill "waived" her objection to the trial court's statutory interpretation by not raising the issue at the hearing. The general rule provides that "[i]ssues not properly raised on appeal will be deemed to be waived." *Pele Defense Fund v. Paty,* 73 Haw. 578, 613, 837 P.2d 1247, 1268 (1992), *cert. denied,* 507 U.S. 918, 113 S.Ct. 1277, 122 L.Ed.2d 671 (1993). In *State Farm Mut. Auto. Ins. Co. v. Dacanay,* 87 Hawai'i 136, 145 n. 14, 952 P.2d 893, 902 n. 14 (1998), the Intermediate Court of Appeals succinctly explained that appellate courts:

> will not consider an issue not raised below unless justice so requires. *Earl M. Jorgensen Co. v. Mark Constr. Inc.,* 56 Haw. 466, 476, 540 P.2d 978, 985 (1975); *Han v. Yang,* 84 Hawai'i 162, 176–77, 931 P.2d 604, 618–19 (App.1997). In determining whether to address a new issue raised on appeal, this court must decide " 'whether consideration of the issue requires additional facts; whether the resolution of the question will affect the integrity of the findings of fact of the trial court; and whether the question is of great public importance.' " *Jorgensen Co.,* 56 Haw. at 476, 540 P.2d at 985 (quoting *Fujioka v. Kam,* 55 Haw. 7, 9, 514 P.2d 568, 570 (1973)).

Considering that additional facts are not required for this court to address the instant statutory interpretation issue, considering that our discussion below directly affects the family court's outcome in this case, and considering the importance of petitions for protection from domestic abuse, this court will consider the issue of statutory interpretation presented in the instant case. *See State v. Bowe,* 77 Hawai'i 51, 53, 881 P.2d 538, 540 (1994) (citation omitted).

### B. *The Family Court Incorrectly Interpreted HRS § 586-3 and Incorrectly Required Hill to Show Recent Acts of Abuse.*

■ "The starting point in statutory construction is to determine the legislative in-

tent from the language of the statute itself." *State v. Kaakimaka*, 84 Hawai'i 280, 289, 933 P.2d 617, 626, *reconsideration denied*, 84 Hawai'i 496, 936 P.2d 191 (1997) (quoting *State v. Ortiz*, 74 Haw. 343, 351–52, 845 P.2d 547, 551–52 (citations omitted), *reconsideration denied*, 74 Haw. 650, 849 P.2d 81 (1993)).

> *When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.*
>
> When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.... In construing an ambiguous statute, "[t]he meaning of the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1–15(1) [ (1993) ]. *Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool . . ...*

*Gray v. Administrative Dir. of the Court*, 84 Hawai'i 138, 148, 931 P.2d 580, 590 (1997) (some brackets in original and some added) (emphases added).

"[A] statute is ambiguous if it is capable of being understood by reasonably well-informed people in two or more different senses." *State v. Toyomura*, 80 Hawai'i 8, 19, 904 P.2d 893, 904 (1995) (citing 2A N. Singer, *Sutherland Statutory Construction*, § 45.02 at 6 (5th ed.1992)) (internal quotation marks omitted). "[A] rational, sensible and practicable interpretation of a statute is preferred to one which is unreasonable or impracticable[.]" *State v. Jumila*, 87 Hawai'i 1, 9, 950 P.2d 1201, 1209 (1998) (quoting *Keliipuleole v. Wilson*, 85 Hawai'i 217, 221–22, 941 P.2d 300, 304–305 (1997) (brackets; internal quotation marks, and citations omitted)). "The legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction[,] and illogicality." *Arceo*, 84

Hawai'i at 19, 928 P.2d at 861 (citation and internal quotation marks omitted).

Turning to the statutory provision in question, HRS § 586–3 [3] provides in pertinent part:

> **Order for protection.** (a) There shall exist an action known as a petition for an order for protection in cases of domestic abuse.
>
> (b) A petition for relief under this chapter may be made by:
>
> (1) Any family or household [member] on his or her own behalf or on behalf of a family or household member who is a minor, or who is incapacitated as defined in section 560:5–101(2), or who is physically unable to go to the appropriate place to complete or file the petition; or
>
> (2) Any state agency on behalf of a person who is a minor, or who is incapacitated as defined in section 560:5–101(2), or a person who is physically unable to go to the appropriate place to complete or file the petition on behalf of that person.
>
> (c) A petition for relief shall be in writing and upon forms provided by the court and *shall allege that a past act or acts of abuse may have occurred, or that the threats of abuse make it probable that acts of abuse may be imminent, or that extreme psychological abuse or malicious property damage is imminent;* and shall be accompanied by an affidavit made under oath or a statement made under penalty of perjury stating the specific facts and circumstances from which relief is sought.

(Alteration in original.) (Emphasis added.)

In comparison, HRS § 586–4 (Supp.1997) provides in pertinent part:

> **Temporary restraining order.** (a) Upon petition to a family court judge, a temporary restraining order *may be granted without notice* to restrain either or both parties from contacting, threatening, or physically abusing each other, notwithstanding that a complaint for annulment,

---

**3.** The amendment to this statute became effective on June 30, 1997. Hill filed for a TRO on November 20, 1997. Therefore, the amendment applies to the instant appeal.

divorce, or separation has not been filed. The order may be granted to any person who, at the time such order is granted, is a family or household member as defined in section 586–1 or who filed a petition on behalf of a family or household member. The order shall enjoin the respondent or person to be restrained from performing any combination of the following acts:

(1) Contacting, threatening or physically abusing the petitioner;

(2) Contacting, threatening or physically abusing any person residing at the petitioner's residence;

(3) Telephoning the petitioner;

(4) Entering or visiting the petitioner's residence; or

(5) Contacting, threatening or physically abusing the petitioner at work.

(b) The family court judge may issue the ex parte temporary restraining order orally, if the person being restrained is present in court. *The order shall state that there is probable cause to believe that a recent past act or acts of abuse have occurred, or that threats of abuse make it probable that acts of abuse may be imminent.* The order shall further state that the temporary restraining order is *necessary for the purpose of preventing acts of abuse, or a recurrence of actual domestic abuse,* and assuring a period of separation of the parties involved. The order shall describe in reasonable detail the act or acts sought to be restrained. Where necessary, the order may require either or both of the parties involved to leave the premises during the period of the order, and may also restrain the party or parties to whom it is directed from contacting, threatening, or physically abusing the applicant's family or household members. The order shall not only be binding upon the parties to the action, but also upon their officers, agents, servants, employees, attorneys, or any other persons in active concert or participation with them.

(Emphases added.)

HRS § 586–5.5 (Supp.1997) provides in pertinent part:

**Protective order.** If after hearing all relevant evidence, the court finds that the respondent has failed to show cause why the order should not be continued and that a *protective order is necessary to prevent domestic abuse or a recurrence of abuse,* the court may order that a protective order be issued for such further period as the court deems appropriate, *not to exceed three years* from the date the protective order is granted. However, *the court may terminate the protective order at any time with the mutual consent of the parties.*

(Emphases added.)

The 1997 Hawai'i legislature amended HRS § 586–3 to remove the term "recent" from "recent past acts." The legislative history provides:

The purpose of this bill is to remove the requirement that judges consider "recent" acts of domestic abuse in determining whether to issue a protective order for victims of domestic violence.... [C]urrent law requires the court to consider "recent" past acts of domestic abuse in determining whether to issue a protective order, and this language has been subject to broad interpretation.... [T]here may be situations where an offender has been incarcerated, residing outside the State, or on extended military deployment, and therefore, the offender has not had contact with or the opportunity to commit "recent" acts of abuse. Yet because of their past history of abuse, the offender may continue to pose a significant danger to the victim or the victim's family. *[The] Committee further believes that removing the term "recent" also provides the court with discretion in determining whether there is adequate evidence to support the need for a protective order.*

Sen. Stand. Comm. Rep. No. 1510, in 1997 Senate Journal, at 1557 (internal quotations in original) (alterations and emphases added).

■ Based upon the plain language of HRS § 586–3 (Supp.1997) and the legislative history explaining its recent amendment, the family court improperly *required* Hill to show recent acts of abuse at the hearing. Although the family court has discretion to examine recent acts, the family court's order

and transcript of the OSC hearing reveal that the court did not consider the other evidence that Hill presented, including "past act or acts of abuse [that] may have occurred, or that the threats of abuse make it probable that acts of abuse may be imminent, or that extreme psychological abuse or malicious property damage is imminent."

Based upon the evidence presented, the family court should have determined whether there was "adequate evidence to support the need for a protective order" without requiring a showing of "recent" acts. A showing of "recent" acts may be an indicator of imminent abuse or damage, but the family court must take into consideration all facts presented by the petitioner and the respondent to determine whether "a protective order is necessary to prevent domestic abuse or a recurrence of abuse[.]"

## IV. CONCLUSION

We vacate the family court's order dissolving the TRO for protection and denying Hill's motion for a protective order. We remand the matter for a new hearing before the family court in accordance with HRS § 586-3 (Supp. 1997) and in accordance with this opinion.