30 P.3d 257

**Estella Murphrey BITNEY,
Plaintiff–Appellant,**

v.

**HONOLULU POLICE DEPARTMENT,** Michael S. Nakamura, individually and in his official capacity as Chief of Police, Robert Prasser, in his capacity as Major, Honolulu Police Department, Marc Greenwell, in his capacity as Captain, Honolulu Police Department, Sam Keliinoi, individually and in his official capacity as Lieutenant, Honolulu Police Department, Barbara Wong, in her capacity as Major, Honolulu Police Department, Joseph Ledbetter, individually and in his capacity as Lieutenant, Honolulu Police Department, City and County of Honolulu, State of Hawai'i, Defendants–Appellees,

and

Monamae N. Kanamu, individually and in her capacity as Supervising Dispatcher, Honolulu Police Department, Betty Sakoda, individually and in her capacity as Supervising Police Dispatcher, Defendants.

No. 22981.

Supreme Court of Hawai'i.

Aug. 23, 2001.

William Tagupa, Honolulu, for the plaintiff-appellant Estella Murphrey Bitney, on the briefs.

James C. Butt and Reid M. Yamashiro (Deputy Corporation Counsel, City and County of Honolulu) for the defendants-appellees Honolulu Police Department, Michael S. Nakamura, Robert Prasser, Marc Greenwell, Sam Keliinoi, Barbara Wong, Joseph Ledbetter, City and County of Honolulu, State of Hawai'i, on the briefs.

MOON, C.J., and LEVINSON, NAKAYAMA, RAMIL, and ACOBA, JJ.

### Opinion of the Court by LEVINSON, J.

The plaintiff-appellant Estella Murphrey Bitney appeals from the judgment of the first circuit court, the Honorable Virginia Lea Crandall presiding, filed on December 22, 1999, pursuant to the summary judgment order of the first circuit court, the Honorable Bode A. Uale presiding, filed on October 15, 1999, in favor of the defendants-appellees Honolulu Police Department, Michael S. Nakamura, individually and in his official capacity as Chief of Police, Robert Prasser, in his capacity as Major, Honolulu Police Department, Marc Greenwell, in his capacity as Captain, Honolulu Police Department, Sam Keliinoi, individually and in his official capacity as Lieutenant, Honolulu Police Department, Barbara Wong, in her capacity as Major, Honolulu Police Department, Joseph Ledbetter, individually and in his capacity as Lieutenant, Honolulu Police Department, City and County of Honolulu, and the State of Hawai'i ("collectively, HPD") and against Bitney. Bitney argues (1) that the circuit court erred in concluding that she was not a disabled person within the meaning of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 through 12213 [1] (ADA) and (2) that a genuine issue of material fact as to whether the HPD took appropriate steps to provide her with a reasonable accommodation with respect to her alleged disability, as required by the ADA, precluded summary judgment. We hold that Bitney failed to meet her burden of producing evidence of sufficient probative value as to give rise to a genuine issue of material fact regarding whether her dyslexia substantially restricted her ability in any major life activity. Because she relied on 42 U.S.C. § 12102(2)(A) to establish that she was disabled within the meaning of the ADA, proof that her impairment substantially limited her in a major life activity was an essential element of a *prima facie* case of employment discrimination based on disability under the ADA. Accordingly, the circuit court did not err in granting the defendants-appellees' motion for summary judgment with respect to Bitney's ADA claim on the ground that she was not a disabled individual within the meaning of the

---

**1.** The relevant provisions of the ADA are as follows:

> The term "disability" means, with respect to an individual—
> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment.
> 42 U.S.C. § 12102(2).

> The term "covered entity" means an employer, employment agency, labor organization, or joint labor-management committee.
> 42 U.S.C. § 12111(2).

> The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.
> 42 U.S.C. § 12111(8).

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.
> 42 U.S.C. § 12112(a).

Act. Inasmuch as Bitney did not have a disability within the meaning of the ADA, her claims arising under the ADA were not viable and her second point of error is moot. Accordingly, we affirm the circuit court's judgment.

## I. *BACKGROUND*

Both parties rely almost verbatim on the circuit court's findings of fact (FOFs) with respect to the background of the present matter. These FOFs were as follows:

1. [O]n April 16, 1992, [Bitney] was hired for the position of police radio dispatcher ("PRD") at the Honolulu Police Department ("HPD").

2. At the time of her hiring, [Bitney] was 31–years old and had been living in Hawai'i since 1989.

3. [Bitney's] qualifications for the position included living independently since high school, maintaining continuous employment of various occupations and skills (spanning 1978 through 1992), receiving a high school diploma and attending several years of college and having special skills at first aid, sign language, and music. In [Bitney's] application for the position with the HPD, she declared that she was physically and mentally fit for the position. She further declared that she was not aware of any reason that would prevent her from fully performing the duties of a PRD.

4. Prior to working for [the] HPD, [Bitney's] high school transcripts showed she made average to above average grades in college and particularly excelled in music.

5. Prior to working for [the] HPD, [Bitney's] employment history demonstrated that she has successfully progressed in job responsibilities and pay. With the increase in responsibility and pay came improvement in skills, training, and experience. At 24–years old, in 1985, she applied at Associated Grocers. She was hired as a clerk and made $6 an hour. She could type, do shorthand and basic calculations using machines. At age 27, in 1987, she applied and was hired by Nordstroms to work on accounts receivable. She became a salaried worker. At Nordstroms, [Bitney] successfully passed various writing, spelling, grammar, accounting, and clerical skills tests. Notably, in a performance review, her evaluator had high praise for her improvement and learning capacity. At age 29 in 1989, she moved to Hawai'i by herself and worked at JN Chevrolet as a car salesman. In her resume, she listed areas of experience and special awards. She fared quite well in a personnel/competency test. At age 30, she worked at Sheraton Princess Kaiulani as a PBX operator. She made over $9 an hour. By this time, she could do anything and everything asked by her employer. She checked off every box in listing her skills/abilities. She left Sheraton with an evaluation of average to above average marks.

6. Prior to working for [the] HPD, [Bitney's] past residences showed [that] she has traveled and lived in various states independently. She has resided in the states of Oregon, Washington, and Oklahoma, as well as Hawai'i.

7. In her attempt to become a PRD, [Bitney] had trouble [completing her training and] qualifying for the position of [a] PRD because she was inaccurate when receiving and transmitting information from callers, misspelling and mispronouncing Hawaiian words, and indecisiveness. [Bitney's] inaccuracies increased when the number of calls increased.

8. Beyond her probationary period of one year and during training, it was discovered that she [might] be dyslexic.[²]

---

**2.** Dyslexia has been defined as "a level of reading ability markedly below that expected on the basis of the individual's level of over-all intelligence or ability in skills," *Stedman's Medical Dictionary* 477 (25th ed.1990), and "inability to read, spell, and write words, despite the ability to see and recognize letters," *Dorland's Illustrated Medical Dictionary* 516 (28th ed.1994). "Even experts disagree as to the correct definition of the term 'dyslexia.'" *Stern v. University of Osteopathic Medicine and Health Sciences,* 220 F.3d 906, 909 (8th Cir.2000) (citing *Bartlett v. New York State Board of Law Examiners,* 970 F.Supp. 1094, 1106–15 (S.D.N.Y.1997), *aff'd in pertinent part,* 156 F.3d 321 (2d Cir.1998), *vacated on other grounds,* 527 U.S. 1031, 119 S.Ct. 2388, 144 L.Ed.2d 790 (1999); *Town of Burlington v. Department of Education,* 736 F.2d 773, 793 (1st

HPD had her tested with the Department's Psychologist, Dr. Eva Stamper, as well as with Assets School. Both Dr. Stamper and Assets School reported that [Bitney] was mildly dyslexic, if at all, and within the context of good general intellectual functioning and with many well-developed compensatory techniques. Dr. Stamper offered suggestions to help [Bitney] qualify [for the position of a PRD] but stated that any final decision can only be based on [Bitney's] actual record and her teachers' and supervisors' observations.

9. Due to [Bitney's] continued determination to qualify and the fact that she could practically do everything required to qualify, [the] HPD implemented some of Dr. Stamper's suggestions to assist [Bitney].[3] [Bitney], however, still made critical errors in receiving and transmitting information while on the radio, which could jeopardize the safety of the public and the police officers.

10. [O]n August 15, 1994, [Bitney] resigned. [The] HPD did not terminate [Bitney].

On August 12, 1996, Bitney filed a complaint in the first circuit court, which was amended on March 17, 1997 to allege (1) a violation of the ADA, (2) constructive discharge in violation of public policy, (3) a violation of Bitney's right to freedom of speech, (4) deprivation of a property interest in violation of Bitney's due process rights, (5) conspiration to injure Bitney, (6) aiding and abetting in wrongful acts against Bitney, (7) negligence, (8) wrongful interference with economic relationship, (9) invasion of privacy, (10) negligent infliction of emotional distress, and (11) intentional infliction of emotional distress. On July 19, 1999, the HPD filed a motion for summary judgment on all counts of Bitney's complaint. With respect to Bitney's ADA claim, the HPD argued that the evidence did not support Bitney's claim that she suffered from dyslexia to a degree that substantially limited her in the major life activities of reading and writing, and, there-

fore, that she failed to establish a *prima facie* case of an ADA violation.

In opposition to the HPD's motion, Bitney argued that there were genuine issues of material fact as to whether she was dyslexic at all and, if she were dyslexic, whether and how her dyslexia impaired her and whether the HPD had accommodated her disability in accordance with the requirements of the ADA. In support of her memorandum in opposition, Bitney filed a declaration, in which she averred, *inter alia*, that: (1) she had received satisfactory performance evaluations during her probationary period of employment with the HPD, but that her supervisor, Monamae N. Kanamu, had stated that, "because [she] was a "haole", Kanamu would make sure that she [would] not pass training to become a [PRD and] informed her that [she] would never understand the local people or the Hawaiian way"; (2) on March 23, 1993, her status had changed from probationary to permanent; (3) in July 1993, her trainer "noted that [she] had problems with displacing of letters and numbers, as well as punctuation problems with Hawaiian street names"; (4) the HPD ordered her to meet with Dr. Stamper, a staff psychologist, and prohibited her from working overtime because of the concern the she was dyslexic; (5) Dr. Stamper referred her for further testing to the Asset School and, by early 1994, she was diagnosed as exhibiting mild dyslexia; (6) the Assets School diagnostician recommended compensatory measures for her dyslexia; (7) in a letter dated January 27, 1994, she requested the HPD to permit her to (a) remain in the Communications Division, (b) use a spell-checker at her work station, (c) change the radio screen color from white print to black print during the time she would be at the radio; and (c) enroll in school as suggested by the Assets School, but the HPD never provided her with the requested accommodations; (8) performance evaluation reports, dated January 16, 1994 and January 29, 1994 and signed by Kanamu, made several references to "the presupposed

Cir.1984) (definition of "dyslexia" is "in flux")). "Dyslexia is unrelated to intelligence." *Taber's Encyclopedic Medical Dictionary* 588 (18th ed.1997). "The exact cause is unknown." *Id.*

3. After reciting this finding in her "statement of the case," Bitney stated in a footnote that she denied that any of the recommendations had been implemented.

dyslexia problems" and "alleged dyslexia"; (9) during a meeting with HPD officials on March 27, 1994, Kanamu (a) recommended that Bitney be terminated, (b) stated that Bitney had prior knowledge of her disability and had hidden it from the HPD, (c) insisted that Bitney eliminate the disability within one month, and (d) informed Bitney that she would be fired if she did not improve her performance within three months; (10) the HPD instituted a special monitoring program for her through which she was observed while on the radio, and any errors were recorded; (11) during the special monitoring, her trainer noted sporadic mistakes when she was assigned to the busiest frequencies but recommended that the training program be brought to an end; (12) on July 4, 1994, Kanamu informed Bitney that she would not terminate the radio training because of her dyslexia but would try to find another position for her that did not involve the radio; (13) she had suffered embarrassment and humiliation in front of her co-workers due to her disability as well as her race; (14) she resigned due to the HPD's failure to respond to her request for special accommodations and the "verbal reprimands" in front of the other workers; (15) she believed that she had suffered from dyslexia for her entire life, as evidenced by (a) her failure to pass English reading classes in seventh and eighth grades, (b) problems as a bank teller due to transposing numbers, and (c) a University of Oregon memorandum dated February 1, 1996 requesting that her instructors make special accommodations for her due to her disability.

The circuit court heard the HPD's motion for summary judgment on August 12, 1999 and orally granted it. On August 18, 1999, Bitney filed a notice of appeal. In No. 22755, we dismissed Bitney's appeal as premature. On October 15, 1999, the circuit court filed its FOFs, conclusions of law (COLs), and order granting summary judgment in favor of HPD and against Bitney. The circuit court's relevant COLs were as follows:

2. In this case, it is not alleged nor is there evidence that [Bitney] has a record of any impairment that substantially limits her major life activities. Likewise, it is not alleged nor is there evidence that [the HPD] regarded [Bitney] as having any impairment that substantially limits her in any major life activities. Accordingly, [Bitney's] alleged disability does not fall under subsection (B) and (C) of 42 USC § 12102 [see supra note 1].

3. The ADA does not define impairment[;] however, caselaw [sic] has established that it must be significant and not trivial, that it must impose a substantial limitation on one or more major life activities. It must presently substantially limit a person as opposed to potentially or hypothetically limit the person. The determination of whether a person has a disability should not be based upon the name or diagnosis of the impairment, but rather the effect the impairment has on the life of the individual....

4. The ADA does not define major life activities but the EEOC has defined it to include learning and working. [Bitney] further contends that it includes reading, writing, thinking and concentrating.

. . . .

6. Even assuming that major life activities include reading, writing, thinking, concentrating, working or learning, [Bitney] is not disabled within the meaning of the ADA.

7. Based upon the facts established by [Bitney's] academic, employment and residential histories, as well as her performance and personnel records at HPD, even assuming [Bitney] suffers from mild dyslexia, her impairment does not significantly presently limit her in any major life activity.

8. Further, although it is unclear whether [Bitney] has asserted that she is substantially limited in the major life activity of working, even if she makes this assertion, the evidence shows that she is not substantially limited in the major life activity of working.

10. Accordingly, [Bitney] is not disabled within the meaning of the ADA and Count I [pertaining to the ADA] is dismissed.

On November 17, 1999, Bitney filed a notice of appeal from the circuit court's October

15, 1999 order. On December 22, 1999, the circuit court entered a judgment in favor of HPD and against Bitney as to all claims asserted by Bitney in the present matter. On January 5, 2000, the circuit court filed another judgment, which was identical to the December 22, 1999 judgment, except that it was signed by Bitney's counsel. Also on January 5, 2000, Bitney filed an amended notice of appeal.

## II. *STANDARDS OF REVIEW*

We review [a] circuit court's award of summary judgment *de novo* under the same standard applied by the circuit court. *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 104, 839 P.2d 10, 22, *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992) (citation omitted). As we have often articulated:

> [s]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

*Id.* (citations and internal quotation marks omitted); *see* Hawai'i Rules of Civil Procedure (HRCP) Rule 56(c) (1990). "A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Hulsman v. Hemmeter Dev. Corp.*, 65 Haw. 58, 61, 647 P.2d 713, 716 (1982) (citations omitted).

*Konno v. County of Hawai'i*, 85 Hawai'i 61, 70, 937 P.2d 397, 406 (1997) (quoting *Dunlea v. Dappen*, 83 Hawai'i 28, 36, 924 P.2d 196, 204 (1996)) (brackets in original). In addition,

> "[t]he evidence must be viewed in the light most favorable to the non-moving party." *State ex rel. Bronster v. Yoshina*, 84 Hawai'i 179, 186, 932 P.2d 316, 323 (1997) (citing *Maguire v. Hilton Hotels Corp.*, 79 Hawai'i 110, 112, 899 P.2d 393, 395 (1995)). In other words, "we must view all of the evidence and the inferences drawn therefrom in the light most favorable to [the party opposing the motion]." *Maguire*, 79 Hawai'i at 112, 899 P.2d at 395 (citation omitted).

*State Farm Mut. Auto Ins. Co. v. Murata*, 88 Hawai'i 284, 287–88, 965 P.2d 1284, 1287–88 (1998) (quoting *Estate of Doe v. Paul Revere Ins. Group*, 86 Hawai'i 262, 269–70, 948 P.2d 1103, 1110–11 (1997)) (some brackets in original and some added).

*Shoppe v. Gucci America, Inc.*, 94 Hawai'i 368, 376, 14 P.3d 1049, 1057 (2000) (quoting *TSA Int'l, Ltd. v. Shimizu*, 92 Hawai'i 243, 251–53, 990 P.2d 713, 721–23 (1999)) (brackets in original).

"Determining whether a claimed impairment constitutes a disability and whether an identified endeavor constitutes a major life activity under the ADA are questions of law for the Court." *Mont–Ros v. City of West Miami*, 111 F.Supp.2d 1338, 1351 (S.D.Fla.2000) (citing *Bragdon v. Abbott*, 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998)); *see also Betts v. Rector and Visitors of the University of Virginia*, 113 F.Supp.2d 970, 981 (W.D.Va.2000) ("The issue of whether [the plaintiff] is 'disabled,' as that term is defined by the ADA in 42 U.S.C. § 12102(2), is a dispositive question of law, not a question of fact."). "Hawai'i appellate courts review conclusions of law *de novo*, under the right/wrong standard. Under the right/wrong standard, this court examines the facts and answers the question without being required to give any weight to the trial court's answer to it." *Robert's Hawaii School Bus, Inc. v. Laupahoehoe Transp. Co., Inc.*, 91 Hawai'i 224, 239, 982 P.2d 853, 868 (1999) (citations, brackets, and internal quotation marks omitted).

## III. *DISCUSSION*

The ADA prohibits employment discrimination against individuals with disabilities. *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 477, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). To state a claim under the ADA, Bitney had to establish that she had a disability within the meaning of the ADA, 42 U.S.C. § 12102(2), *see supra* note 1.

In the ADA, Congress has defined "disability" as: (1) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (2) a record of such impairment; or (3) being regarded as having such impairment. An individual is deemed to be "disabled" for purposes of the ADA if he or she satisfies any one of these three enumerated prongs of the definition.

■ In her complaint, Bitney asserted that her dyslexia substantially limited her in the major life activities of reading and writing and that, consequently, she was an "individual with a disability" within the meaning of the ADA. In her memorandum in opposition to the HPD's motion for summary judgment, she discussed all three prongs of the foregoing definition of "disability," but appeared to be arguing that she was disabled due to her dyslexic condition and did not suggest that the other two prongs of the definition of "disability," namely, "record of impairment" and "being regarded as impaired," applied to her. The circuit court concluded that "it [was] not alleged nor [was] there evidence" that the foregoing two prongs were at issue. In her opening brief, Bitney continued to ignore the possibility that she was "disabled" due to the existence of a history or a record of her impairment or having been mistakenly regarded · as impaired. Only in her reply brief did she expressly contend that the fact that she was "regarded as being impaired" was relevant to her claim under the ADA.

■ "The general rule provides that '[i]ssues not properly raised on appeal will be deemed to be waived.'" *Hill v. Inouye*, 90 Hawai'i 76, 82, 976 P.2d 390, 396 (1998) (quoting *Pele Defense Fund v. Paty*, 73 Haw. 578, 613, 837 P.2d 1247, 1268 (1992)) (brackets in original); *see* Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(4) (2000) ("Points of error not presented [in the opening brief] in accordance with this section will be disregarded, except that the appellate court, at its option, may notice a plain error not presented."); HRAP Rule 28(b)(7) (2000) ("Points not argued [in the opening brief] may be deemed waived.").

[Appellate courts] will not consider an issue not raised below unless justice so requires. *Earl M. Jorgensen Co. v. Mark Constr. Inc.*, 56 Haw. 466, 476, 540 P.2d 978, 985 (1975); *Han v. Yang*, 84 Hawai'i 162, 176–77, 931 P.2d 604, 618–19 (App. 1997). In determining whether to address a new issue raised on appeal, this court must decide " 'whether consideration of the issue requires additional facts; whether the resolution of the question will affect the integrity of the findings of fact of the trial court; and whether the question is of great public importance.'" *Jorgensen Co.*, 56 Haw. at 476, 540 P.2d at 985 (quoting *Fujioka v. Kam*, 55 Haw. 7, 9, 514 P.2d 568, 570 (1973)).

*Hill*, 90 Hawai'i at 82, 976 P.2d at 396. In the ADA context, when the plaintiff made no argument that the second or third prong of the definition of disability was satisfied, other courts have analyzed the claim only under the first prong. *See, e.g., Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 563 n. 9, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999) ("[The appellant] did not challenge that aspect of the Court of Appeals's decision [in which it discussed the plaintiff's disability under the third prong of the definition] in its petition for certiorari and we therefore do not address it."); *Swain v. Hillsborough County School Board*, 146 F.3d 855, 857 (11th Cir. 1998); *but see, e.g., Epstein v. Kalvin Miller Int'l, Inc.*, 100 F.Supp.2d 222, 224–25 (S.D.N.Y.2001) (holding that, inasmuch as existence of disability under ADA was question of law, court would disregard parties' "stipulation" that plaintiff was disabled and would independently review record *de novo* to resolve issue of whether plaintiff was disabled in deciding defendant's motion for summary judgment). Accordingly, we need not reach the issues of whether Bitney was disabled because of a "record of impairment" or "being regarded as impaired."

■ "The courts apply a three-part test to determine whether a plaintiff has an actual disability under the ADA. *See Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 641 (2d Cir.1998) (citing *Bragdon v. Abbott*, 524 U.S. 624, 632, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998)). First, the Court must consider whether plaintiff's conditions

are 'physical [or mental] impairments' [within the meaning of the ADA]." *Epstein,* 100 F.Supp.2d at 225. The ADA-implementing regulations define a "physical or mental impairment" as any "mental or psychological disorder, such as ... specific learning disabilities." 29 C.F.R. § 1630.2(h)(2). In its appendix to 29 C.R.R. Part 1630, the EEOC states that "an individual who is unable to read because of dyslexia would be an individual with a disability because dyslexia, a learning disability, is an ·impairment." 29 C.F.R. Pt. 1630, App. § 1630.2(j). Accordingly, courts have held dyslexia to be a "physical or mental impairment" under 42 U.S.C. § 12102(2)(A). *See, e.g., Bartlett v. New York State Board of Law Examiners,* 226 F.3d 69, 79 (2d Cir. 2000); *Betts,* 113 F.Supp.2d at 976 & n. 4 (noting that, under ADA, "[a]pplicable 'physical or mental impairments' include 'specific learning disabilities' and holding that plaintiff's learning disability that included slow reading rate qualified under 42 U.S.C. § 12102(2)(A)"); *Meekison v. Voinovich,* 17 F.Supp.2d 725, 731 (S.D.Ohio 1998) ("this court finds that, as a matter of law, dyslexia qualifies as an 'impairment' under the ADA"). We likewise hold in the present matter that dyslexia is a "physical or mental impairment" within the meaning of 42 U.S.C. § 12102(2)(A).

The record is inconclusive as to whether Bitney actually had dyslexia. There is no unequivocal evidence of such a diagnosis. However, Bitney apparently underwent professional evaluations by a police psychologist, Dr. Stamper, and the Assets Schools. Dr. Stamper concluded in her report that Bitney's test results were "consistent with the profile of mild dyslexia, with well developed compensatory strategies." The Assets School reached substantially the same conclusion. Thus, the record creates a genuine issue of fact—material or otherwise—as to whether Bitney actually suffered from dyslexia and, viewing the evidence in the light most favorable to her claim, we assume that she indeed was dyslexic.

■ "The Court must next consider whether the life activities allegedly affected by the impairment 'are "major" life activities under the ADA.' " *Epstein,* 100 F.Supp.2d at 225 (quoting *Colwell,* 158 F.3d at 641–42 (citing *Bragdon,* 524 U.S. at 632, 118 S.Ct. 2196)). "The phrase 'major life activities' is defined as 'functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.' " *Betts,* 113 F.Supp.2d at 976 (emphasis omitted) (quoting 28 C.F.R. § 35.104). Reading, writing, learning, thinking, and concentrating have all been held to be "major life activities" under the ADA. *See, e.g., Bartlett,* 226 F.3d at 80 (reading); *Gonzales v. National Bd. of Medical Examiners,* 225 F.3d 620, 626 (6th Cir.2000) (reading and writing); *Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 306 (3d Cir.1999) (thinking); *Betts,* 113 F.Supp.2d at 976 (learning); *Walsted v. Woodbury County,* 113 F.Supp.2d 1318, 1329–31 (N.D.Iowa 2000) (learning, reading, thinking, concentrating); *but see Pack v. Kmart Corp.,* 166 F.3d 1300, 1305 (10th Cir.1999) (concluding that concentrating was not a major life activity within the meaning of the ADA). Accordingly, we assume that the activities on which Bitney relies in pressing her ADA claim qualify as "major life activities" for purposes of this appeal.

■ "Finally, the Court must consider whether the plaintiff's impairment "substantially limits" the major life activity he [or she] has identified." *Epstein,* 100 F.Supp.2d at 226.

The Act defines a "disability" as "a physical or mental impairment that *substantially limits* one or more of the major life activities" of an individual. § 12102(2)(A) (emphasis added). Because the phrase "substantially limits" appears in the Act in the present indicative verb form, we think the language is properly read as requiring that a person be presently—not potentially or hypothetically—substantially limited in order to demonstrate a disability. A "disability" exists only where an impairment "substantially limits" a major life activity, not where it "might", "could", or "would" be substantially limiting if mitigating measures were not taken. A person whose physical or mental impairment is corrected by medication or other measures does not

have an impairment that presently "substantially limits" a major life activity. To be sure, a person whose physical or mental impairment is corrected by mitigating measures still has an impairment, but if the impairment is corrected it does not "substantially limi[t]" a major life activity.

The definition of disability also requires that disabilities be evaluated "with respect to an individual" and be determined based on whether an impairment substantially limits the "major life activities of such individual." § 12102(2). Thus, whether a person has a disability under the ADA is an individualized inquiry. *See Bragdon v. Abbott*, 524 U.S. 624, [641–42], 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (declining to consider whether HIV infection is a *per se* disability under the ADA); 29 CFR pt. 1630, App. § 1630.2(j) ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual").

*Sutton*, 527 U.S. at 482–83, 119 S.Ct. 2139.

 Even in the light most favorable to Bitney, the record in the present matter cannot reasonably be construed to allege facts that, if true, would support a conclusion that dyslexia "substantially limited" Bitney in any of her major life activities. Her diagnosis of dyslexia was, at most, "mild," in large measure because of apparently well-developed compensatory techniques. Thus, even in the context of psychological testing, it was difficult to detect that Bitney was impaired in her reading and writing abilities. In fact, all her test scores, which included reading, writing, and learning aptitude tests, fell within, at the least, average classification, the overall assessment of her cognition placing her on the high side of average.

In order for [Bitney] to establish that [she] is disabled for purposes of the ADA, [she] must show that [her] disability restricts [her] ability to learn[, read, or write] in comparison to the average person in the general population.

In making such a determination, the court takes into account [Bitney's] ability to mitigate, or successfully cope with, the effects of [her] disability.

*Betts*, 113 F.Supp.2d at 977 (footnote omitted).

A helpful example of this standard is set out in *Price v. National Board of Medical Examiners*, 966 F.Supp. 419, 427 (S.D.W.Va.1997):

Take, for example, two hypothetical students. Student A has average intellectual capability and an impairment (dyslexia) that limits his ability to learn so that he can only learn as well as ten percent of the population. His ability to learn is substantially impaired because it is limited in comparison to most people. Therefore, Student A has a disability for purposes of the ADA. By contrast, Student B has superior intellectual capability, but her impairment (dyslexia) limits her ability so that she can learn as well as the average person. Her dyslexia qualifies as an impairment. However, Student B's impairment does not substantially limit the major life function of learning, because it does not restrict her ability to learn as compared with most people. Therefore, Student B is not a person with a disability for purposes of the ADA.

*Id.* at 977 n. 6. Inasmuch as Bitney's psychological test results placed her within the average range and did not reveal any abnormalities, she was therefore not substantially limited in the major life activities of reading, writing, and learning. *Compare Betts*, 113 F.Supp.2d at 977–78, *and Gonzales*, 225 F.3d at 626–30, *with Bartlett*, 226 F.3d at 80–81, *and Merry v. Sulka & Co., Ltd.*, 953 F.Supp. 922, 926–27 (N.D.Ill.1997).

 Bitney's reliance on the February 1, 1996 memorandum of the University of Oregon counselor for students with disabilities is likewise unhelpful to her position. The memorandum, which was prepared long after her discharge from HPD employment and shortly before she filed the present complaint, is laden with hearsay, and its admissibility is questionable. Be that as it may, the memorandum merely states in relevant part that "[w]e have on file information documenting that [Bitney] has a learning disability. This

is characterized by difficulties with reading comprehension, spelling, and writing expression. She has relative strengths in visual memory, and her learning abilities are greatly enhanced by hands-on activities." Thus, based on unidentified documentation, presumably supplied by Bitney, the University of Oregon required Bitney's instructors in her music courses to make accommodations for her as required by law. The memorandum did not state that the university had independently determined that Bitney had a learning disability, but rather that it had information on file that documented her disability. Furthermore, the memorandum was prepared approximately two years after the events at issue in the present matter. Accordingly, the relevance of the memorandum as to the extent of Bitney's alleged disability and its effect upon her functioning when she was employed by the HPD is, at most, vaporous.

■ Similarly, Bitney's alleged failure to pass English reading classes in her seventh and eighth grade years and problems as a bank teller due to transposing numbers do not construct a genuine issue of material fact as to whether her dyslexia limited her in any major life activity. There is simply no evidence that her problems at school or as a bank teller many years before she commenced her employment with the HPD were related to dyslexia. Any inference in that regard amounts to sheer speculation. In any event, her failure of two classes at school and as a bank teller does not give rise to a genuine issue of material fact as to whether she was substantially impaired in reading, writing, or learning, even if they were related to dyslexia. After all, she successfully completed high school education and several years of college with average to above average grades and proved competent in a variety of positions during her working career.

■ Similarly, the facts that Bitney exhibited difficulty in accurately receiving and transmitting information while operating the HPD's radio dispatch system and that she was misspelling and mispronouncing Hawaiian place names does not directly bear upon the issue as to whether Bitney's dyslexia substantially limited her in such activities as reading, writing, or learning. They are relevant only to Bitney's dyslexia's effect upon her ability to work as a PRD. In *Sutton*, the United States Supreme court assumed, without deciding, that working was a major life activity for the purposes of the ADA and analyzed the question as to when an individual is "substantially limited in the major life activity of working" as follows:

> When the major life activity under consideration is that of working, the statutory phrase "substantially limits" requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs....
>
> ... To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice. If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.

*Sutton*, 527 U.S. at 491–92, 119 S.Ct. 2139; *see also Murphy v. United Parcel Service, Inc.*, 527 U.S. 516, 522–23, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999). Accordingly, a limitation with respect to a particular position, such as a PRD, does not constitute a substantial limitation in the major life activity of working. There is no evidence in the record that Bitney was unsuited for any job other than a PRD, much less a "broad range of jobs."

Bitney has failed to meet her burden of producing evidence of sufficient probative value as to give rise to a genuine issue of material fact as to whether her dyslexia substantially restricted her abilities to read, write, learn, concentrate, think, or engage in any other major life activity. Inasmuch as Bitney relied on 42 U.S.C. § 12102(2)(A) to establish that she was disabled within the meaning of the ADA, proof that her impairment substantially limited her in a major life activity was an essential element of a *prima facie* case of employment discrimination based on disability under the ADA. Accordingly, the circuit court did not err in granting the HPD's motion for summary judgment

with respect to Bitney's ADA claim on the ground that Bitney was not disabled within the meaning of the Act.

■ Inasmuch as Bitney did not have a disability within the meaning of the ADA, she was not entitled to the Act's protections. *See Gordon v. E.L. Hamm & Assoc., Inc.,* 100 F.3d 907, 915 (11th Cir.1996). "Employers have no duty to accommodate an employee if the employee is not disabled under the ADA." *Swain,* 146 F.3d at 858. Therefore, we do not consider Bitney's argument that there was a genuine issue of material fact as to whether the HPD reasonably accommodated her. *See id.*

## IV. CONCLUSION

Based on the foregoing reasoning, we affirm the circuit court's judgment in favor of the HPD and against Bitney, filed on December 22, 1999.