**Electronically Filed
Supreme Court
SCAP-23-0000416
09-JUN-2025
09:53 AM
Dkt. 14 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

ANN GIMA,
Plaintiff-Appellant,

vs.

CITY AND COUNTY OF HONOLULU,
Defendant-Appellee.

SCAP-23-0000416

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CAAP-23-0000416; CASE NO. 1CC181001745)

JUNE 9, 2025

RECKTENWALD, C.J., McKENNA, EDDINS, GINOZA, AND DEVENS, JJ.

OPINION OF THE COURT BY DEVENS, J.

## I.  INTRODUCTION

This transfer case from the Intermediate Court of Appeals (ICA) is an appeal involving disability discrimination, failure to provide a reasonable accommodation, and retaliation claims. Plaintiff-Appellant Ann Gima (Gima) appeals the circuit court's May 22, 2023 Findings of Fact, Conclusions of Law, and Order Granting Defendant-Appellee City and County of Honolulu's (City

Motion for Judgment on the Pleadings and/or Summary Judgment (Order) and the Judgment entered on June 5, 2023.

Gima was employed with the City's Department of Budget and Fiscal Services' (BFS) Real Property Assessment Division for over twenty years. After she was promoted to Real Property Technical Officer (RPTO) in 2012, Gima contends that her direct supervisor, Robert Magota (Magota), began to verbally harass and abuse her, which resulted in her being diagnosed with major depressive disorder and anxiety disorder. The City placed Gima on workers' compensation leave after she was medically restricted from working with Magota. Gima was on leave intermittently from 2014 to February 2018.

In November 2017, Gima requested a reasonable accommodation to work with a supervisor other than Magota due to her medical condition and related work restriction. The City denied her request. At the time, Gima was enrolled in the City's workers' compensation Priority Placement Program to find her an alternate position in another City department. However, at the end of 2017, Magota retired from BFS. In February 2018, Gima returned to work at BFS as she was no longer subject to Magota's supervision. On April 27, 2018, less than three months after returning from leave, Gima's new supervisor, Steven Takara (Takara), issued her a substandard performance evaluation and Gima was subsequently demoted to Real Property Appraiser IV.

2

BFS Director, Nelson Koyanagi, Jr. (Koyanagi), issued the written notification of Gima's demotion and directed her to address her questions and concerns with Takara. At the time of the substandard evaluation and demotion, Takara was purportedly aware of Gima's prior issues with Magota, Gima's medical diagnoses, and Gima's workers' compensation leave taken from September 2017 through January 2018.

Gima filed claims with the Hawai'i Civil Rights Commission (HCRC) asserting disability discrimination and retaliation, and subsequently filed a timely lawsuit in the Circuit Court of the First Circuit (circuit court). Her suit claimed that the City discriminated against her because of her disability, denied her a reasonable accommodation, and retaliated against her based on two prior HCRC complaints she filed in 2016 and the reasonable accommodation request she submitted in November 2017. The City moved for summary judgment on all claims, which the circuit court granted.

Gima contends the circuit court erred in finding that she failed to establish a prima facie case of disability discrimination or retaliation and further contends the City's purported reasons for her demotion were pretextual. She also asserts the circuit court erred in concluding that her request for an alternate supervisor was unreasonable as a matter of law, and further contends that the City failed to provide a

3

reasonable accommodation when she requested a different supervisor.

Viewing the evidence and the inferences drawn therefrom in the light most favorable to Gima, we hold that Gima established a prima facie case of disability discrimination, and, therefore, the court erred in granting summary judgment on that claim. Gima met her summary judgment burden of establishing that she had a disability, was qualified for her position, and was issued a substandard performance evaluation and demoted because of her disability. There is also a genuine issue of material fact that the City's proffered reasons for Gima's negative evaluation issued in April 2018 and subsequent demotion were pretextual.

We further hold that Gima's request for an alternate supervisor was not, as a matter of law, an unreasonable accommodation, and that Gima established a genuine issue of material fact as to whether the City could have assigned her to a different direct supervisor. However, the City was only required to provide a reasonable accommodation rather than Gima's specific request, and, even when viewing the evidence in the light most favorable to Gima, the record demonstrates that the City engaged in an interactive process to accommodate Gima. It is uncontested that the City offered Gima a position in the Department of Transportation Services as part of its Priority Placement Program before Magota retired in 2017. However, while

4

the City was in the process of transferring Gima to the Department of Transportation Services, Magota retired and Gima elected to return to her original position at BFS. At the time, Gima's only medical restriction was working with Magota. Under these facts and circumstances, Gima failed to establish a genuine issue of material fact that the City failed to engage in a good faith interactive process to accommodate her.

We further hold that the circuit court erred in granting the City's motion for summary judgment with respect to Gima's retaliation claim. Gima engaged in protected activities when she filed two complaints with the HCRC in 2016 and requested a reasonable accommodation in 2017. Gima suffered an adverse employment action when the City issued her a substandard performance evaluation and demoted her in 2018. And Gima met her burden establishing a causal connection between the protected activities and the subsequent adverse employment acts. As stated, Gima established a genuine issue of material fact as to whether the City's proffered reasons for her negative performance evaluation and demotion were pretextual.

For the reasons discussed below, we affirm in part and vacate in part the circuit court's May 22, 2023 Order and June 5, 2023 Judgment. We remand this case for further

proceedings consistent with this opinion.

## II.   BACKGROUND

Gima was first employed with BFS from 1987 to 1992.  After a brief hiatus, she returned to her employment at BFS in 1995. In 2000, Gima was promoted to Real Property Appraiser VI.  In 2012, she was promoted to the position of RPTO which is when Magota became her direct supervisor.  From 2013 through 2017, Gima made multiple complaints that Magota had subjected her to verbal harassment and abuse.  This harassment, Gima contends, led to her being medically diagnosed with a "disabling anxiety disorder" and major depressive disorder.  Based on her anxiety and depression, Gima filed a workers' compensation stress claim and was placed on workers' compensation leave intermittently from 2014 to 2018.

## A.   Gima's Workers' Compensation Claims 2014 to 2016

Gima asserts that beginning in December 2012 "Mr. Magota began a campaign of intensely abusive behavior, hostility, personal attacks, harassment, discrimination, and retaliation against [her] resulting in unbearable working conditions."  Gima filed a workplace violence complaint with the City against Magota on October 29, 2013.  In February 2014, Gima informed BFS Deputy Director Gary Kurokawa (Kurokawa) and BFS Director Koyanagi "that Mr. Magota was making derogatory remarks about [her]."  Gima reported Magota to the City's Equal Opportunity

6

Office on June 23, 2014. In December 2014, Gima was diagnosed with an anxiety disorder "as a result of Mr. Magota's relentless treatment against [her]."

In December 2014, Gima submitted a workers' compensation injury claim with the City and was placed on workers' compensation leave for her anxiety disorder. From December 2014 to February 2016, Gima remained on leave.[1] During that time period, Gima requested a reasonable accommodation to be assigned to a supervisor other than Magota, which the City denied.[2] In February 2016, Gima returned to work. The evidence from Gima's physician, Raymond Davidson, M.D. (Dr. Davidson), showed that Gima was diagnosed with major depressive disorder in January 2016. The City's own independent doctor also diagnosed Gima with an anxiety disorder.

**B.  Gima's Harassment Allegations Against Magota 2013 to 2016**

The evidence indicates that from 2013 to 2016, the Equal Opportunity Office investigated Gima's workplace violence complaint filed against Magota and issued findings that "did not support a determination of workplace violence or harassment as alleged"; however, the "investigative panel did find that stress

---

[1]    Gima's declaration stated that she was out on leave from December 2014 to early March 2015, and later from March 2015 to February 11, 2016.

[2]    Gima attested that her request for a reasonable accommodation was denied on or about October 14, 2015.

in the workplace is escalating and may reach detrimental levels if not address[ed] and diffused."  On April 18, 2016, BFS Director Koyanagi sent Magota a letter as a "follow-up to the meeting that Gary Kurokawa and [Koyanagi] had with [Magota] on April 13, 2016 regarding the [Equal Opportunity Office] complaint filed by Ann Gima on June 23, 2014."  Koyanagi's letter stated that "the cumulative consequence of [Magota's] actions and inactions culminated in harassment, although not related to [Gima's] gender, and that [Magota] exercised [his] authority in a manner that accelerated rather than quelled further dispute with [Gima]."

C.    **Gima's HCRC Charges 2016**

On March 14, 2016, Gima filed an HCRC complaint alleging discrimination by the City on the basis of her sex and disability.  The HCRC charge notified BFS Director Koyanagi of Gima's charges, which included assertions that she had been harassed by Magota and was "denied a reasonable accommodation for [her] disability (mental)."  Gima's March 2016 HCRC complaint also alleged that in 2015, she was denied her reasonable accommodation request "to work under the direction of someone other than Mr. Magota."  Gima did not file a lawsuit within the statutory period after receiving her right to sue letter from the HCRC for her March 2016 HCRC complaint.

On November 2, 2016, Gima filed a second HCRC complaint

asserting sex discrimination and retaliation.  Gima asserted that she was "subjected to harassment due to [her] sex (female) and/or in retaliation for [her] opposition to discrimination."  A notice of the charge was addressed to BFS Director Koyanagi.  Again, Gima did not file a lawsuit within the statutory period after receiving her right to sue letter from the HCRC.

**D.   Gima's Negative Reviews 2017**

In January 2017, Gima received a substandard performance evaluation from Magota for the January 23, 2016 to January 22, 2017 rating period.  Gima attested that she "did not receive negative performance evaluations until after Mr. Magota received the letter from the [Equal Opportunity Office] in 2016."  The evidentiary record confirms that the first negative evaluation Gima received was on January 23, 2017, after she filed her 2016 HCRC complaints.  The other evaluations were dated June 2017, September 2017, and April 2018.  The January 2017 review stated that Gima did "very little work" on an annual report from 2016; did not properly train and support her staff; and that Magota "found Gima to be difficult to work with, argumentative, uncooperative and defiant."  In response, Gima submitted a written rebuttal asserting, inter alia, that the issues proffered by Magota were either never raised formally or the projects were not assigned to her; she adequately led trainings for her staff; and "Magota's personal bias is the determinate

9

factor in this rating."

On May 16, 2017, Takara was promoted to Real Property Assessment Administrator, a position senior to Gima's. Magota remained as the Assistant Real Property Assessment Administrator and Gima's direct supervisor.

Gima was placed on a special three-month performance evaluation from June 19, 2017 to September 18, 2017, "due to the substandard performance evaluation" from the prior rating period. On September 14, 2017, Magota gave Gima another substandard evaluation and extended her special performance evaluation period an additional three months. Takara signed off on the September 2017 substandard evaluation. The performance evaluation stated that Gima had met several times with both Takara and Magota during the rating period to discuss her work performance. In the evaluation, Magota asserted that Gima made errors in the quarterly budget; failed to make progress on the implementation of a "New Home Exemption Review Program"; did not accept responsibility for her assignments; demonstrated "disrespect" when she "became argumentative with her superior, Takara"; and "lack[ed] job knowledge." Gima submitted a rebuttal to the evaluation asserting, among other things, that the issues with the budget were also due to the lack of review by the administration, lack of communication, and a "formula error"; the New Home Exemption Review Program was initiated by

Magota and assigned to Takara, and the project was partially stalled due to delays on Takara's part; Magota unreasonably faulted her for a problem that a vendor and Takara had been unable to solve for years; and the other incidents cited by Magota were "clouded" by Magota's bias.

**E.    Gima's Workers' Compensation Leave 2017 to 2018**

On September 15, 2017, Gima was again placed on workers' compensation leave due to her medical condition (anxiety and major depressive disorders) and remained on leave through January 31, 2018.

On November 15, 2017, Gima submitted another request for a reasonable accommodation asking that she be supervised by someone other than Magota as he exacerbated her anxiety disorder.  Gima's request for a different supervisor was pursuant to "the advice of [her] physician as well as the City's own IPE doctor, Dr. Joseph Rogers."  Gima attested that "a change in personnel," after Takara was promoted to RPA Administrator, allowed her to "be supervised by a higher-level Administrator," and that Mr. Takara, Mr. Kurokawa, or Mr. Koyanagi could have supervised her at that time.  On December 5, 2017, BFS denied Gima's reasonable accommodation request.

Gima was enrolled in the City's Priority Placement Program from October 11, 2017 to February 1, 2018.  The City was in the

process of placing Gima in a position with the Department of Transportation Services when Magota retired from BFS. Magota retired on December 30, 2017, and, as a result, Takara became Gima's new BFS supervisor. The City informed Gima that she could return to work at her BFS position subject to her doctor's approval.

F.   Gima's Negative Review and Demotion 2018

On February 1, 2018, with Takara serving as Gima's new direct supervisor, Gima returned to work at BFS with her doctor's approval. There is no evidence in the record that Gima's previously diagnosed medical conditions of anxiety and major depressive disorder had resolved before or after she returned from leave.

Within a few weeks after returning to work, Gima asserted that she met with Takara who "criticized [her] for many very small issues, such as typographical errors, and other issues that occurred while [she] was out on worker[s'] compensation leave." BFS informed Gima that her special performance evaluation period that was interrupted by her prior leave would resume on February 1, 2018 through April 30, 2018.

On April 27, 2018, Takara met with Gima and gave her a substandard performance evaluation. That same day, the City issued Gima a letter demoting her to Real Property Appraiser IV. BFS Director Koyanagi signed off on the demotion letter and

copied Takara.  Gima's demotion was effective May 7, 2018.

Takara's April 2018 substandard evaluation stated: (1) Gima made careless errors in a report published in September 2017; (2) her finalized testimony for a bill contained an incorrect date on the second page header and a data table that did not fit on the page; (3) she "critique[ed]" Takara's comments in response to one of her assignments; (4) she failed to give feedback on her outstanding assignments; and (5) she "push[ed] work onto others" and "continued her pattern of poor communication."  The evaluation also described an incident where Gima purportedly failed to communicate the location of a meeting with a vendor.

Gima submitted a five-page written rebuttal of the evaluation, asserting, inter alia: (1) she regularly gave feedback on outstanding assignments at weekly branch meetings; (2) Takara failed to give her clear direction on her assignments; and (3) Takara refused to assist her or her subordinates.  Gima disputed that the typographical error impacted operations in a manner warranting a substandard performance review, and asserted that she never received feedback on the bill testimony.  As to the claim that she failed to communicate the location of a vendor meeting, Gima asserted that this was a mix-up because "[e]very meeting" took place at BFS's office, but in this instance the vendor scheduled the

13

meeting at the vendor's facility.  Gima also claimed that she did not timely learn of the change in meeting location.

## G.    Gima's HCRC Complaints 2018 and Subsequent Workers' Compensation Leave

On April 30, 2018, Gima filed a third HCRC complaint asserting disability discrimination and retaliation by the City. In her HCRC complaint, Gima asserted that she was "denied a reasonable accommodation based upon [her] disability" when the City denied her request for a supervisor other than Magota on December 5, 2017.  She claimed that the City "failed to engage in the proper interactive process to accommodate [her] disability" and violated her rights in denying her a reasonable accommodation.  Gima also asserted that she continued to be "over-scrutinized and subjected to unfair negative performance evaluations based upon [her] disability and in retaliation for filing discrimination complaints with the [HCRC] on March 14, 2016 and on November 2, 2016."

Gima's physician, Dr. Davidson, signed a "disability determination form" dated May 29, 2018, stating that Gima had been suffering from major depressive disorder from January 2016 through at least May 29, 2018, which caused her to experience "anxiety," "fear," "fatigue," and "poor concentration." Dr. Davidson further stated that Gima's major depressive disorder ("depressed mood, anxiety, insomnia, fatigue, no

energy, loss of appetite, fear, unable to think, poor concentration") substantially affected her "[r]eading, working, socializing, speaking, [and] interpersonal relationships."

On June 7, 2018, Gima was placed on workers' compensation leave due to her medical conditions and was excused from work from April 30, 2018 to October 1, 2018. Gima was unable to return to BFS because of her medical restriction.

On June 14, 2018, Gima filed a fourth HCRC complaint asserting that she "was demoted in retaliation for filing discrimination complaints with the [HCRC] on March 14, 2016 and November 2, 2016." Gima asserted that her 2018 substandard performance evaluation and demotion were retaliatory acts, and denied that her work performance was "below standard."

Gima was issued right to sue letters for her HCRC complaints on August 3, 2018 and September 5, 2018.

### III. CIRCUIT COURT PROCEEDINGS

Gima timely filed suit in the circuit court asserting claims for disability discrimination, failure to provide a reasonable accommodation, and retaliation in violation of Hawaiʻi Revised Statutes (HRS) § 378-2. The City filed a motion for summary judgment on March 3, 2023. Following a hearing, the circuit court granted the City's motion for summary judgment on Gima's disability discrimination, reasonable accommodation, and

15

retaliation claims.[3]

As to Gima's disability discrimination claim, the circuit court concluded that Gima had not established a prima facie case of disability discrimination because: (1) she was not disabled as a matter of law since she was not "substantially limited in a major life activity"; (2) she was not qualified for her position as an RPTO; and (3) her April 2018 substandard evaluation and subsequent demotion were not based on her disability because she "was no longer disabled" at the time the evaluation and demotion were issued. Even if Gima had established a prima facie case of disability discrimination, the court found that the City offered "legitimate nondiscriminatory reasons" for not accommodating Gima's request for a different supervisor and for giving Gima a substandard performance evaluation, which were not "pretextual."

The court also found that the City did not deny Gima a reasonable accommodation. The court determined as a matter of law that Gima's request for a supervisor other than Magota was not a reasonable accommodation. Even if Gima's request had been reasonable on its face, the court concluded that the City adequately engaged in an interactive process with Gima when she was enrolled in the City's Priority Placement Program and offered a position in a different department.

---

[3]     The Honorable Kevin T. Morikone presided.

16

As to Gima's retaliation claim, the court concluded that Gima could not pursue her claim that the City retaliated against her for requesting a reasonable accommodation in November 2017. The court determined that Gima "failed to exhaust her administrative remedies" because she did not raise this particular claim in her 2018 HCRC charges, which were the bases for her circuit court complaint. The court also determined that Gima failed to allege this claim in her civil complaint. The court then considered Gima's claim that the City retaliated against her after she filed her two 2016 HCRC charges, and concluded that pursuing charges with the HCRC was a protected activity which met the first prong of her retaliation claim.

The court also found that Gima had satisfied the second prong of her retaliation claim because "adverse actions include demotions and negative performance evaluations if accompanied with removal from the position," and the "denial of a request for reasonable accommodation can arguably be viewed as an adverse act."

However, the court determined that Gima "failed to raise a genuine issue of material fact as to whether there is a causal link" between the 2016 HCRC charges and the adverse actions (the denial of her request for a reasonable accommodation in December 2017 and the negative evaluation and demotion in April 2018). The court based this conclusion on the "lack [of] temporal

proximity" since more than a year had passed between the protected activities and adverse acts.  The court also based the lack of causation on the absence of evidence in the record establishing that supervisor Takara, who issued Gima's negative performance review, was aware of the 2016 HCRC complaints.

Gima appealed the circuit court's order granting the City's motion for summary judgment, and subsequently applied for transfer to this court, which we granted.

### IV.  STANDARD OF REVIEW

> We review a circuit court's award of summary judgment de novo under the same standard applied by the circuit court. Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.  The evidence must be viewed in the light most favorable to the non-moving party.

Adams v. CDM Media USA, Inc., 135 Hawaiʻi 1, 12, 346 P.3d 70, 81 (2015) (citing Shoppe v. Gucci Am., Inc., 94 Hawaiʻi 368, 376, 14 P.3d 1049, 1057 (2000)) (cleaned up); Hawaiʻi Rules of Civil Procedure (HRCP) Rule 56(c) (eff. 2000) ("The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.").

18

"This court may affirm a grant of summary judgment on any ground appearing in the record, even if the circuit court did not rely on it." Reyes v. Kuboyama, 76 Hawai'i 137, 140, 870 P.2d 1281, 1284 (1994).

## V. DISCUSSION

### A. Disability Discrimination

Gima established a prima facie case of disability discrimination. She met her summary judgment burden of establishing a genuine issue of material fact that her major depressive disorder and anxiety disorder constituted a disability under HRS Chapter 378, she was qualified for her position with a reasonable accommodation, and she was issued a negative evaluation and demoted because of her disability.

HRS § 378-2(a) provides in relevant part, that "[i]t shall be an unlawful discriminatory practice" for any employer "to refuse to hire or employ or to bar or discharge from employment, or otherwise to discriminate against any individual in compensation or in the terms, conditions, or privileges of employment" because of a person's "disability." HRS § 378-2(a)(1)(A) (2015). In line with HRS § 378-2(a), Hawai'i Administrative Rules (HAR) § 12-46-181 "prohibits any employer or other covered entity from discriminating in employment against individuals or persons because of a disability." HAR §

19

12-46-181 (eff. 2012).

To establish a prima facie case of disability discrimination, Gima must demonstrate: (1) she is an individual with a "disability" within the meaning of HRS Chapter 378; (2) she is "qualified to perform the essential duties of . . . her job with or without reasonable accommodation"; and (3) she suffered an adverse employment decision because of her disability. French v. Hawaii Pizza Hut, 105 Hawai'i 462, 467, 99 P.3d 1046, 1051 (2004) (citation omitted).

1. **There are genuine issues of material fact as to whether Gima was disabled within the meaning of HRS § 378-1.**

HRS § 378-1 defines disability as "the state of having a physical or mental impairment which substantially limits one or more major life activities, having a record of such an impairment, or being regarded as having such an impairment." HRS § 378-1 (2015); see HAR § 12-46-182 (eff. 2012).

First, Gima established she suffered a "mental impairment" within the meaning of HRS § 378-1. HAR § 12-46-182 defines a "physical or mental impairment" as including "[a]ny mental or psychological disorder, such as an . . . emotional or mental illness" including "major depression." HAR § 12-46-182. The record shows that Gima's physician, Dr. Davidson, diagnosed her with anxiety in 2014 and "major depressive disorder" in 2016. Gima attested that the City's independent examiner, Dr. Joseph

Rogers (Dr. Rogers), concurred and also diagnosed her with an anxiety disorder.

Second, there is a genuine issue of material fact that Gima's anxiety and major depressive disorders "substantially limited" her major life activities.  HAR § 12-46-182 defines "[m]ajor life activities" as "[b]asic activities that most people in the general population can perform with little or no difficulty," and includes reading, concentrating, thinking, interacting with others, and working.  HAR § 12-46-182; see also Bitney v. Honolulu Police Dep't, 96 Hawaiʻi 243, 252, 30 P.3d 257, 266 (2001) ("The phrase 'major life activities' is defined as functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.  Reading, writing, learning, thinking, and concentrating have all been held to be 'major life activities' under the ADA.") (internal citations and quotations omitted).

"An impairment need not prevent, or severely or significantly restrict, a person from performing a major life activity in order to be considered substantially limiting." HAR § 12-46-182.  "Certain impairments such as . . . major depressive disorder . . . should easily be concluded to be substantially limiting."  Id.  Determining whether an employee's impairment "substantially limits" a major life activity "requires a case-by-case analysis looking at the effect the

21

impairment has on the life of the individual." French, 105 Hawai'i at 469, 99 P.3d at 1053 (quotations and citations omitted); see also Bitney, 96 Hawai'i at 253, 30 P.3d at 267 ("[W]hether a person has a disability under the ADA is an individualized inquiry.").

Gima asserts, and her doctor's report confirms, that from January 2016 through at least May 29, 2018, her major depressive disorder caused "depressed mood, anxiety, insomnia, fatigue, no energy, loss of appetite, fear, unable to think [sic], [and] poor concentration" which substantially affected her major life activities of "[r]eading, working, socializing, speaking, [and] interpersonal relationships." Viewed in the light most favorable to Gima, a trier of fact could reasonably infer from this evidence that Gima began suffering from an anxiety disorder and major depressive disorder in 2014 and 2016 respectively, which substantially limited her major life activities, and that she continued to suffer from these impairments when she was issued the negative evaluation and demoted in 2018.

The City does not dispute that Gima suffered from anxiety or depression. Rather, the City takes the position that Gima was not disabled as a matter of law when she returned to work in February 2018 because: (1) her medical condition was caused by her supervisor, Magota; (2) her sole work restriction was

working with Magota; and (3) she was able to return to work in February 2018 after Magota retired, thus, the City contends, her impairment had completely resolved when she returned to work. In other words, it was presumed that Gima's medical conditions fully resolved by virtue of Magota's retirement and her return to work.

Based on the evidence, and contrary to the City's interpretation, the circuit court erred in finding that Gima "no longer suffered a disability" as of February 1, 2018 when she returned to work. There is no indication in the record that Gima's anxiety or depression abruptly ended when Magota retired or when she returned to BFS in 2018. To the contrary, Dr. Davidson's medical report indicates that Gima continued to suffer from her medical conditions, including major depressive disorder, through at least May 29, 2018. While Gima returned to work in February 2018, a reasonable fact-finder could infer that she was able to return to work solely because Magota retired and was no longer supervising her, which was the reasonable accommodation she had requested of the City on the advice of Dr. Davidson and Dr. Rogers prior to Magota's retirement.

The circuit court erroneously conflated Gima's ability to return to work under a new direct supervisor with the termination of her disability. A change in work restrictions and the ability to return to work does not necessarily indicate

a person is free from their disability. While the City correctly notes that "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working," Gima asserts substantial limitations in multiple areas of her life other than her inability to work at BFS which is supported by Dr. Davidson's medical report. See HAR § 12-46-182; Bitney, 96 Hawai'i at 254, 30 P.3d at 268. This evidence establishes a genuine issue of material fact.

Even if Gima's impairment could be construed as "episodic" or in remission at certain points between 2014 to 2018, Gima has met her burden of establishing that she suffered an active disability that substantially limited her major life activities in April 2018, when she was issued her substandard performance evaluation and subsequently demoted. HAR § 12-46-182 ("An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active. Examples of impairments that may be episodic or in remission include . . . major depressive disorder.") Further, both parties submitted exhibits showing that from September 2017 through January 2018 Gima was on approved workers' compensation leave because of her medical conditions, which indicates that Gima's medical conditions continued after Magota retired at the

end of 2017.

Because a reasonable fact-finder could infer that Gima was suffering from a disability that substantially limited her major life activities in April 2018, Gima raised a genuine issue of material fact as to whether she was disabled under HRS § 378-1, and the court erred in concluding otherwise.

2.  **There is a genuine issue of material fact that Gima was qualified for her position with a reasonable accommodation.**

In addition to being disabled, Gima established a genuine issue of material fact that she was "qualified to perform the essential duties of . . . her job with or without reasonable accommodation." French, 105 Hawai'i at 467, 99 P.3d at 1051.

HAR § 12-46-182 defines "qualified" as:

> "Qualified" with respect to a person with a disability means a person with a disability who satisfies:
>
> (1)  The requisite skill, experience, education, and other job-related qualification standards of the employment position such person holds or desires; and
>
> (2)  Who, with or without reasonable accommodation, can perform the essential functions of such position.

HAR § 12-46-182 (emphasis added).

Whether Gima was qualified for her position as an RPTO poses two questions: (1) did Gima have the requisite qualifications, and could she perform the "essential functions" of an RPTO; and (2) if Gima needed an accommodation to perform the essential functions of an RPTO, was the accommodation

25

reasonable?

There is a genuine issue of material fact as to whether Gima had the "requisite skill, experience, [and] education" and could perform the "essential functions" of an RPTO. "Essential functions" refers to the "fundamental job duties of the employment position[.]" HAR § 12-46-182. Whether a "particular function is essential should reflect the actual functioning and circumstances of the particular job." Id. In this case, the circuit court erred in finding that Gima "cannot do the essential functions of her job based on multiple substandard ratings by two different supervisors over a period of time[.]" In opposing the City's motion for summary judgment, Gima submitted the rebuttals she provided to the City in response to her negative performance reviews, and asserted that the reviews were based on "discriminatory animus."

Viewing the evidence in the light most favorable to Gima, it can be reasonably inferred that Gima was adequately performing the "essential functions" of her job despite the substandard reviews issued in 2017 and 2018. First, the substandard performance reviews issued in 2017 were both completed by Magota, who Gima asserts retaliated and discriminated against her. The City did not include a counter declaration from Magota in support of its motion for summary judgment. Second, the City does not contest that Gima did not

26

receive any negative reviews prior to 2016.  Based on the evidence presented, Magota issued Gima's first negative review in January 2017 after Gima lodged several charges against him with the City and submitted two HCRC complaints asserting that Magota had engaged in disability discrimination, sex discrimination, and retaliation against her.

Gima also met her summary judgment burden in countering the City's assertion that she did not complete her work with adequate quality.  In her declaration, Gima stated that she was either not assigned certain work or she was not given proper guidance.  Further, while the 2017 reviews asserted that Gima struggled to timely complete long-term projects, evidence presented by both parties indicates Gima was consistently absent from the office because she was out on authorized workers' compensation leave for almost all of 2015 and part of 2017.

Gima also disputes the evaluation she received from Takara in 2018 after he became her direct supervisor.  In Gima's declaration, she attested that the tasks she was accused of not adequately performing in 2018 were either joint projects, and therefore not her sole responsibility, or she was unaware of those assignments because Takara failed to inform her of her responsibilities when she returned to BFS.  Gima further stated that when she returned to work in February 2018, Takara met with her within a few weeks to "criticiz[e] [her] for many very small

27

issues, such as typographical errors, and other issues that occurred while [she] was out on worker[s'] compensation leave."

Gima presents sufficient evidence controverting the City's claim that she was inadequately performing at BFS, and, therefore, viewed in the light most favorable to Gima, there is a genuine issue of material fact as to her qualifications serving in her role as an RPTO. See Nationstar Mortg. LLC v. Kanahele, 144 Hawai'i 394, 401-02, 443 P.3d 86, 93-94 (2019) ("[A] party moving for summary judgment is not entitled to a judgment merely because the facts he offers appear more plausible than those tendered in opposition or because it appears that the adversary is unlikely to prevail at trial . . . if the evidence presented on the motion is subject to conflicting interpretations, or reasonable men might differ as to its significance, summary judgment is improper.") (citation omitted).

The circuit court further erred in finding that Gima was unqualified for her position simply because she was medically restricted from working with Magota. To determine whether Gima was qualified to work as an RPTO in BFS, with or without reasonable accommodation, we must first address whether Gima's request for a supervisor other than Magota was a reasonable accommodation request.

Whether an employee's request for an alternate supervisor

28

can be construed to be a reasonable accommodation request is an issue of first impression for this court. We hold that requesting an alternate supervisor is not unreasonable as a matter of law. Whether such a request is reasonable must be determined on a case-by-case basis by conducting an individualized inquiry into whether the employer can reasonably accommodate such a request. See Hamilton v. GlaxoSmithKline, LLC, 414 F.Supp.3d 1286, 1294-95 (D. Mont. 2019) (declining to adopt a per se rule that assigning a new supervisor is not a reasonable accommodation), aff'd, 835 Fed. Appx. 936 (9th Cir. 2021); see also Kennedy v. Dresser Rand Co., 193 F.3d 120, 122-23 (2d Cir. 1999).

HAR § 12-46-182 defines "reasonable accommodation," in relevant part, as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a person with a disability to perform the essential functions of that position[.]" HAR § 12-46-182. This includes modifications such as "[j]ob restructuring," "part-time or modified work schedules," or "reassignment to a vacant position[.]" Id.

Neither French nor Bitney considered whether requesting an alternate supervisor can be a reasonable accommodation; however, in both cases we emphasized that an "individualized" approach is necessary in assessing disability discrimination claims.

29

French, 105 Hawaiʻi at 469-70, 99 P.3d at 1053-54; Bitney, 96 Hawaiʻi at 253, 30 P.3d at 267.  Applying a similar "individualized" approach to a reasonable accommodation request, i.e., considering whether the request is reasonable in the context of an employee's workplace, is consistent with both our disability discrimination caselaw and statutory framework.

While there are certainly situations where requesting another supervisor would be untenable for a business or would be excessively disruptive and pose an undue hardship, we do not find it persuasive that it is unreasonable, as a matter of law, to request another supervisor as a reasonable accommodation.  We find the Montana District Court's reasoning in Hamilton v. GlaxoSmithKline, LLC persuasive.

> If a court were to hold that, under the facts and circumstances of a particular case, assignment to another supervisor was a reasonable accommodation, its decision would not necessarily force a dramatic restructuring of an organizational chart.  For example, imagine that a large business employs forty customer service representatives, twenty of whom are randomly assigned to one supervisor, and twenty to another.  Assuming that one of the representatives has a disability which means that she can successfully work under one supervisor but not the other, reassignment would carry with it minimal expense and disruption.

Hamilton, 414 F.Supp.3d at 1294.

Because this case was decided by summary judgment, Gima's burden was to establish a genuine issue of material fact as to whether it was reasonable to have an alternate supervisor assigned to her.  The record reveals conflicting evidence that

30

gives rise to a genuine issue of material fact as to whether someone at BFS other than Magota could have supervised Gima. Gima worked for many years at BFS and in her declaration stated that either "Mr. Takara, Mr. Kurokawa, or Mr. Koyanagi could have been directed to supervise [her]." Gima added that the "change in personnel" that occurred at BFS would have allowed her to change supervisors in 2017.

The City primarily argued that Gima's declaration did not establish that she had "personal knowledge" to attest that someone else could have supervised her. Additionally, Takara stated in his declaration that it "would not be possible" for someone other than Magota to have supervised Gima because, as of May 2017, Takara was "newly promoted" and the division was "short staffed." The City did not proffer a specific reason as to why Koyanagi or Kurokawa would have been unable to supervise Gima.

The City's argument that Gima did not have the requisite knowledge to attest that Takara, Kurokawa, or Koyanagi could have supervised her is unavailing. Gima's declaration was made "upon [her] personal knowledge and belief," and recited that she had worked continuously at BFS since 1995. When Gima was promoted to RPTO in July 2012, she had over twenty years of experience working in the City's Real Property Assessment Division and twelve years of supervisory experience. Gima

31

further stated that her direct supervisor Magota lacked the knowledge and understanding involved with the functioning of the City's Real Property Assessment Division and recalled Kurokawa performing some of Magota's job duties and conducting weekly meetings in 2017.  Gima's declaration demonstrates her personal knowledge of the inner workings and operations of BFS, and Takara, Kurokawa, and Koyanagi's roles in the Real Property Assessment Division.  Viewed in the light most favorable to Gima, there is a genuine issue of material fact as to whether Takara, Kurokawa, or Koyanagi could have supervised Gima when she submitted her reasonable accommodation request in November 2017.  See Nozawa v. Operating Eng'rs Loc. Union No. 3, 142 Hawai'i 331, 333, 418 P.3d 1187, 1189 (2018) ("[HRCP Rule 56(e)] does not preclude an affidavit from being self-serving, nor does it require an affidavit to be corroborated by independent evidence.").

In sum, the evidence presented by the parties raised a genuine issue of material fact as to whether the City could have had Takara, Kurokawa, or Koyanagi supervise Gima without incurring excessive disruptions or imposing an undue hardship. Gima also met her burden of establishing that she was qualified for her BFS position with the reasonable accommodation of a different supervisor.  See HAR § 12-46-187(a) ("It is unlawful for an employer or other covered entity not to make reasonable

32

accommodation to the known physical or mental limitations of an applicant or employee with a disability who is otherwise qualified, unless such employer or entity can demonstrate that the accommodation would impose an undue hardship on the operation of its business") (eff. 2012).

> **3.      There is a genuine issue of material fact that Gima was issued a negative performance evaluation and demoted because of her disability.**

Gima has also demonstrated a genuine issue of material fact that she was discriminated against "because" of her disability. See French, 105 Hawai'i at 467, 99 P.3d at 1051.

The circuit court determined that Gima did not meet the third prong of her prima facie disability discrimination claim because: (1) Gima was "no longer disabled" at the time of her 2018 evaluation; (2) Gima did not establish that Takara knew of her disability; and (3) even if Takara knew of her disability, Gima did not establish evidence that her negative review and demotion were because of her disability.

First, as previously stated, the circuit court erred in determining that Gima was no longer disabled at the time of her 2018 evaluation and demotion.

Second, there is a genuine issue of material fact that Takara, who issued Gima's substandard evaluation in 2018, and Koyanagi, who issued Gima's 2018 demotion and copied Takara, were both aware of Gima's disability.  "An employer has notice

33

of the employee's disability when the employee tells the employer that [s]he is disabled." King v. Steward Trumbull Mem'l Hosp., Inc., 30 F.4th 551, 563 (6th Cir. 2022) (citations omitted). An employee need not explicitly use the word "disabled" or "disability" to put an employer on notice of their condition; however, an employer must have "enough information about the employee's condition to conclude that [an employee] is disabled." Id. (citations omitted). "Relevant information could include, among other things, a diagnosis, a treatment plan, apparent severe symptoms, and physician-imposed work restrictions." Id. at 564 (citations omitted).

Gima has met her burden of establishing a genuine issue of material fact that her supervisors, including Takara and Koyanagi, had knowledge of her condition. Takara claimed that he did not know Gima had a disability. However, Takara also attested that: (1) he was aware of Gima's complaints against Magota (one of which included a disability discrimination complaint); (2) he knew of Gima's "pattern of claiming stress when needing to interact with Magota"; (3) he knew Gima was on workers' compensation leave from September 15, 2017 to January 31, 2018; and (4) he was aware that Gima had made an accommodation request for "someone other than Magota [to] supervise her[.]"

As to BFS Director Koyanagi, he previously received notice

34

of Gima's March 14, 2016 HCRC complaint in which she alleged

that the City had discriminated against her on the basis of her

disability.

Gima further attested that "[a]ll of [her] supervisor[s]

and other administrators were aware of [her] leave and the . . .

reasons for [her] leave."  Gima also attested,

> Many of my colleagues were aware of the symptoms of my
> condition as I shared my state of mind and anxiety/stress
> with them.  I even sent an email asking them not to be
> alarmed that my office door would be mostly closed as
> hearing Magota in his office next to mine provoked my
> anxiety.

Viewed in the light most favorable to Gima, a reasonable

fact-finder could infer from the evidence that supervisors

Magota, Takara, and Koyanagi were aware of her medical

condition.[4]

Third, there is a genuine issue of material fact that

Gima's substandard review and demotion were because of her

disability rather than her actual performance.  See French, 105

Hawai'i at 467, 99 P.3d at 1051.  The close proximity between

Gima's return from workers' compensation leave and the

---

[4]     At oral argument, the City asserted it had no knowledge of
Dr. Davidson's May 29, 2018 report noting the substantial effect Gima's major
depressive order had on various life activities until Gima filed the instant
case.  Oral Argument at 46:40-48:56, http://oaoa.hawaii.gov/jud/oa/24/SCOA-
103124-SCAP-23-0000416.mp3 [https://perma.cc/WMV5-BSE2].  Even assuming the
City was not aware of Dr. Davidson's report, the record presents sufficient
evidence that a genuine issue of material fact exists as to whether Gima's
supervisors knew of her disability.  See King, 30 F.4th at 564 (concluding
that an employer's awareness of a medical condition coupled with the
employee's notification of such condition presents a factual issue as to
whether the employer knew of the employee's disability).

substandard performance evaluation and demotion support a reasonable inference that the substandard review and demotion were based on her disability.  See Butler v. City of Prairie Vill., Kan., 172 F.3d 736, 749 (10th Cir. 1999) ("The temporal proximity of Plaintiff's request for an accommodation to the decline in his work evaluations and his supervisors' complaints about his work performance contributes to an inference that Plaintiff's position was eliminated because of his disability.").

The record reflects that Gima was on workers' compensation leave because of her anxiety and depression from September 2017 to February 2018.  Shortly after she returned from leave in February 2018, Gima received a negative review from her new supervisor, Takara.  Gima's declaration stated that she met with Takara on February 23, 2018, a few weeks after she returned to work, at which time Takara "criticized" her for "very small issues, such as typographical errors" and "other issues that occurred while [she] was out on worker[s'] compensation leave." Two months later, Takara gave Gima a substandard evaluation and Gima was demoted.  Gima attested that the evaluation was unfounded, "undeserved," and "reflect[ed] a discriminatory animus against [her]."  A reasonable fact-finder could infer that Takara and Koyanagi knew of Gima's disability, Takara issued a substandard review because of Gima's disability, and

Gima's disability was a factor in her demotion.

Thus, Gima has met her burden of establishing a genuine issue of material fact that there was a causal connection between her medical condition and leave and her 2018 performance review and subsequent demotion.  See Knodle v. Waikiki Gateway Hotel, Inc., 69 Haw. 376, 389, 742 P.2d 377, 385 (1987) ("Inasmuch as causal relation is one of fact, '[i]t is [a question] for the jury, except when the facts are such that they will support only one reasonable inference.'") (quoting L. Green, Rationale of Proximate Cause 132 (1927) (emphasis original).

4.   **There is a genuine issue of material fact that the City's proffered reasons for Gima's negative performance evaluation and demotion were pretextual.**

As Gima has established a prima facie case of disability discrimination, the burden shifts to the City "to provide a legitimate, nondiscriminatory reason for the adverse employment action[.]"  Lales v. Wholesale Motors Co., 133 Hawai'i 332, 356, 328 P.3d 341, 365 (2014) (quoting Schefke v. Reliable Collection Agency, Ltd., 96 Hawai'i 408, 426, 32 P.3d 52, 70 (2001)).  "[I]f the defendant articulates such a reason, the burden shifts back to the plaintiff to show evidence demonstrating that the reason given by the defendant is pretextual."  Id. at 356-57, 328 P.3d

at 365-66 (quoting Schefke, 96 Hawai'i at 426, 32 P.3d at 70).

A "legitimate" reason is defined as "lawful," or "genuine." Adams, 135 Hawai'i at 15, 346 P.3d at 84 (citing Black's Law Dictionary 984 (9th ed. 2009)). A "legitimate reason must be one that is justifiable in view of the purposes of the statute," and the explanation "must be in the form of admissible evidence and must clearly set forth reasons that, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the challenged employment action." Id. (citations, quotations, and brackets omitted).

To rebut Gima's prima facie case, the City proffered Gima's alleged poor work performance as the reason for Gima's substandard review in 2018 and subsequent demotion. The City pointed to Gima's evaluations from 2017 and 2018 that detailed issues with her work, including her purported unwillingness to do certain tasks and a tendency to make errors. Takara and Kurokawa also attested to Gima's performance issues.

"[T]he nondiscriminatory reason articulated by the employer for the adverse employment action must be related to the ability of the individual to perform the work in question." Adams, 135 Hawai'i at 22, 346 P.3d at 91. In this case, the City's proffered reason could be found to be a legitimate, non-discriminatory reason relating to Gima's "ability . . . to

perform the work in question."  See id.

Because the City's evidence could be construed as adequately demonstrating a legitimate, non-discriminatory reason for Gima's substandard evaluation and demotion, the burden shifts back to Gima to establish that the City's reason was "pretextual."  Lales, 133 Hawai'i at 356-57, 328 P.3d at 365-66. Gima may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  Id. at 358, 328 P.3d at 367 (quoting Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 256 (1981)).

> The plaintiff can discredit the proffered reasons by demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the defendant's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the defendant did not act for the asserted nondiscriminatory reasons.

Adams, 135 Hawai'i at 45, 346 P.3d at 114 (Recktenwald, C.J., concurring and dissenting) (quoting Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 277 (3d Cir. 2010)).

Gima has presented sufficient evidence to establish a genuine issue of material fact that the City's proffered reasons for her demotion were pretextual.  See Lales, 133 Hawai'i at 358-62, 328 P.3d at 367-71.

Gima presented evidence that contradicts and discredits the

substandard reviews issued in 2017 and 2018, and she disputes underperforming at her job. In her declaration, Gima attested that she was not given adequate supervision while working with Magota and that many of her supposed inadequacies reflected assignments that were not solely under her purview. In her rebuttal to the 2018 performance evaluation, Gima asserted that Takara blamed her for oversights that were not her responsibility and that his representations of her performance were "incomplete."

The "temporal proximity" of Gima's return from workers' compensation leave and the negative review and demotion further supports her pretext contention. See Lales, 133 Hawai'i at 358, 328 P.3d at 367 (concluding that temporal proximity supported plaintiff's claim that his termination was pretext for a discriminatory motive).

Gima's substandard evaluations began after she filed complaints against Magota in 2016 and after she filed her workers' compensation claim. As to Takara, Gima asserted that he met with her within a few weeks after she returned from workers' compensation leave in 2018 to "criticiz[e]" her for "issues that occurred while [she] was out on worker[s'] compensation leave." The April 2018 review was issued less than three months after Gima returned from leave and approximately five months after she requested a reasonable accommodation to

have an alternate supervisor.

There is also sufficient evidence in the record for a fact-finder to infer that Magota's purported discriminatory animus was imputed to Takara's 2018 evaluation of Gima under a "cat's paw" theory. See Adams, 135 Hawai'i at 47, 346 P.3d at 116 (Recktenwald, C.J., concurring and dissenting). "[U]nder a 'cat's paw' theory an employer may be liable where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action." Id. (quotations and citation omitted). Gima's declaration, which attested to Magota's "bias" against her, and the 2017 substandard performance reviews, which Magota issued after Gima returned from workers' compensation leave related to her anxiety and major depressive disorders, create a genuine issue of material fact that Magota exhibited animosity towards Gima because of her disability. As stated, the City did not submit a declaration from Magota.

While Magota retired prior to Gima's April 2018 evaluation and demotion, there is a genuine issue of material fact as to whether his purported discriminatory animus could be imputed to Takara, who issued Gima's 2018 performance evaluation. Takara attested that he and Magota had discussed Gima's complaints against Magota and her performance while Magota supervised her. Takara's 2018 evaluation of Gima also referenced Gima's

41

performance while Magota supervised her. Under these circumstances, a reasonable fact-finder could infer that Magota's evaluations and purported discriminatory animus affected the April 2018 evaluation issued by Takara, and Gima's subsequent demotion.

Based on the evidence adduced, there is a genuine issue of material fact that Gima's BFS supervisors knew of her disability, Gima was subject to an adverse action, and the adverse employment actions were based on her disability. Gima has further established a genuine issue of material fact that the City's purported reasons for her 2018 review and demotion were pretextual. Therefore, the court erred in granting the City's motion for summary judgment as to Gima's disability discrimination claim.

B. **Failure to Accommodate**

Gima also asserts that the City failed to accommodate her request for a reasonable accommodation to be supervised by someone other than Magota, thus violating HAR § 12-46-187(a). We disagree. Even when viewing the evidence in a light most favorable to Gima, the record reflects that after she requested a reasonable accommodation, the City engaged in an interactive process with Gima that resulted in finding an alternate position in a different department. Gima does not dispute that the City

was in the process of transferring her when Magota retired.

The City was not required to provide the exact accommodation Gima had requested.  Therefore, we hold that the City did not fail to provide a reasonable accommodation and the circuit court did not err in granting the City's motion for summary judgment as to Gima's reasonable accommodation claim.

Under HAR § 12-46-187(a),

> It is unlawful for an employer or other covered entity not to make reasonable accommodation to the known physical or mental limitations of an applicant or employee with a disability who is otherwise qualified, unless such employer or entity can demonstrate that the accommodation would impose an undue hardship on the operation of its business.  An employee does not have to specifically request a "reasonable accommodation", but must only let the employer know that some adjustment or change is needed to do a job because of limitations caused by a disability.

To be entitled to a reasonable accommodation, an employee must demonstrate they have a disability and are "qualified" for the position.  HAR § 12-46-187(a).  A reasonable accommodation can include "[j]ob restructuring" or "reassignment to a vacant position."  HAR § 12-46-182; see also Suzuki v. State, 119 Hawai'i 288, 300, 196 P.3d 290, 302 (App. 2008).

The City argues that even if Gima was entitled to a reasonable accommodation, the City was not required to accommodate Gima's exact request to be assigned a new supervisor.  Further, at the time of Gima's request, the City asserts, and Gima does not dispute, that she was enrolled in the City's workers' compensation Priority Placement Program which

was working on having Gima transferred to a different department, which would have placed Gima outside of Magota's supervision.  In response, Gima argues that the City did not engage in any "interactive process," as required under HAR § 12-46-187(b), and that the Priority Placement Program was not a substitute for the required process.

HAR § 12-46-187(b) provides,

> To determine the appropriate reasonable accommodation, it shall be necessary for an employer or other covered entity to initiate an interactive process, after a request for an accommodation, with the person with a disability in need of the accommodation.  This process shall identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

HAR § 12-46-187(b) (eff. 2012) (emphasis added).

As discussed, Gima's request for an alternate supervisor was not unreasonable as a matter of law, and there is a genuine issue of material fact as to whether the City could have reasonably accommodated Gima with another supervisor.  However, an "employer is not obligated to provide an employee the accommodation [s]he requests or prefers, the employer need only provide some reasonable accommodation."  Zivkovic v. S. Cal. Edison Co., 302 F.3d 1080, 1089 (9th Cir. 2002) (citation omitted).

While the City was not required to provide the specific accommodation Gima requested, the City was required to engage in a good faith interactive process when she requested a reasonable

44

accommodation.  HAR § 12-46-187(b).  Here, the City fulfilled its obligation.  The Ninth Circuit has held that the interactive process requires: (1) "direct communication between the employer and employee to explore in good faith the possible accommodations"; (2) "consideration of the employee's request"; and (3) "offering an accommodation that is reasonable and effective."  Zivkovic, 302 F.3d at 1089 (citation omitted).

In this case, Gima does not establish a genuine issue of material fact as to whether the City adequately engaged in a good faith interactive process after she requested a reasonable accommodation.  The evidence presented by both parties shows that on November 15, 2017, Gima requested a reasonable accommodation for a different supervisor because she was medically restricted from working with Magota.  The City's Department of Human Resources forwarded the request to BFS the same day.  BFS denied Gima's request on December 5, 2017.

During this time, Gima was enrolled in the City's workers' compensation Priority Placement Program, and the City was working with her in their efforts to find her a position in another department where she would not be supervised by Magota. The record demonstrates, and Gima does not dispute, that in December 2017 the City found Gima a position in the Department of Transportation Services and that she was in the process of transferring to that position when Magota retired from BFS.

45

Although the Priority Placement Program may have been related to the City's workers' compensation process, it was nonetheless a substantive interactive process that served the purpose of finding Gima an alternative and suitable position. At the time, not being supervised by Magota was Gima's sole medical work restriction. After Magota retired, Gima was able to return to work with Takara as her new supervisor, which accommodated her work restriction, and therefore Gima did not go forward with the transfer to the Department of Transportation Services.

In sum, Gima did not demonstrate any genuine issue of material fact that supports a finding of a breakdown of the interactive process. Cf. Humphrey v. Mem'l Hosp. Ass'n, 239 F.3d 1128, 1137–39 (9th Cir. 2001) (concluding that plaintiff sufficiently demonstrated a breakdown in the interactive process, and, thus the employer failed to provide a reasonable accommodation). Instead, the record demonstrates that when Gima requested a reasonable accommodation to work with a supervisor other than Magota, the City responded and provided her with an alternate position outside of Magota's supervision. When Magota retired, the impetus for Gima's request for a reasonable accommodation dissipated and Gima elected to return to her BFS position under Takara's supervision. Therefore, the circuit court did not err in granting the City's motion for summary

judgment on Gima's reasonable accommodation claim.

**C.    Retaliation**

**1.    Gima sufficiently raised that the City retaliated against her for requesting a reasonable accommodation on November 15, 2017.**

Gima contends the City retaliated against her in violation of HRS § 378-2(a)(2) after she filed two separate HCRC complaints in 2016 and requested a reasonable accommodation in November 2017.  The circuit court determined that Gima could not pursue her retaliation claim based on her request for a reasonable accommodation because Gima failed to raise this claim and exhaust her administrative remedies with the HCRC and failed to assert this allegation in her civil complaint.  We disagree and hold that Gima properly raised this claim in her April 2018 HCRC charge and in her civil suit.

Prior to filing her circuit court complaint, Gima was first required to file her charges for retaliation with the HCRC, which has jurisdiction over claims brought under HRS Chapter 378.  HRS §§ 368-11, 368-12 (2015); see Kellberg v. Yuen, 131 Hawai'i 513, 531, 319 P.3d 432, 450 (2014) ("the doctrine of exhaustion of remedies requires an aggrieved party to exhaust administrative remedies before seeking judicial review").  Gima filed two separate charges with the HCRC in 2018.  In Gima's HCRC complaint filed on April 30, 2018, she asserted both disability discrimination and retaliation claims stating that

47

"[o]n November 15, 2017 [she] requested another accommodation not to be supervised by Robert Magota" and she was targeted because of the "harassment and disability discrimination" complaints and "was subjected to over-scrutinization of [her] work[.]"  In Gima's HCRC complaint filed on June 14, 2018, she asserted that she was demoted by the City in retaliation for filing HCRC charges in March 2016 and November 2016.  After the HCRC issued right to sue letters related to her 2018 HCRC complaints, Gima timely filed her civil complaint in the circuit court pursuant to HRS § 368-12.

Employee HCRC complaints are to be construed liberally and a plaintiff's civil claims should be considered as reasonably related to the allegations in the HCRC charges "to the extent that those claims are consistent with the plaintiff's original theory of the case."  French, 105 Hawai'i at 476, 99 P.3d at 1060 (quoting B.K.B. v. Maui Police Dep't, 276 F.3d 1091, 1100 (9th Cir. 2002) abrogated on other grounds by Fort Bend Cnty., Tex. v. Davis, 587 U.S. 541 (2019)).  Applying the liberal construction standards set by this court in French, and, contrary to the circuit court's determination, we conclude that Gima's April 30, 2018 HCRC complaint, in which she checked the box for both disability discrimination and retaliation and raised her November 15, 2017 request for a reasonable accommodation, adequately raised her claim that the City

retaliated against her for requesting a reasonable accommodation. Gima also alleged in her civil suit that the City retaliated against her after she requested a new supervisor as a reasonable accommodation in November 2017. Because Gima's April 2018 HCRC charge is sufficiently "consistent" with the "theory of the case" laid out in her civil complaint, the court erred in finding that Gima failed to exhaust her administrative remedies with the HCRC. Cf. French, 105 Hawai'i at 477, 99 P.3d at 1061 (holding that plaintiff's gender discrimination claim was not consistent with her HCRC complaint, which solely indicated disability and age discrimination).

The circuit court also erred in its determination that Gima failed to properly plead that the City retaliated against her for requesting a reasonable accommodation in her civil complaint. This court has expressly reaffirmed a "liberal" notice pleading standard. Bank of Am., N.A. v. Reyes-Toledo, 143 Hawai'i 249, 263, 428 P.3d 761, 775 (2018) overruled on other grounds by Wilmington Sav. Fund Soc'y, FSB v. Domingo, 155 Hawai'i 1, 556 P.3d 347 (2024). Gima's circuit court complaint alleged her request for a reasonable accommodation in her statement of facts, which she incorporated into her claim for retaliation. Applying our liberal notice pleading standard, Gima's circuit court complaint sufficiently alleged that the

City retaliated against her for requesting a reasonable accommodation, and the court erred in finding that Gima could not pursue this claim. HRCP Rule 8(f) ("All pleadings shall be so construed as to do substantial justice.") (eff. 2000).

2. **There is a genuine issue of material fact as to Gima's retaliation claim.**

We further hold that the circuit court erred in granting the City's motion for summary judgment as to Gima's retaliation claim based on her two HCRC complaints filed in 2016 and her request for a reasonable accommodation submitted on November 15, 2017. Gima established a prima facie retaliation claim and raised a genuine issue of material fact as to whether the City's proffered reasons for her negative evaluation and demotion were pretextual. See Lales, 133 Hawai'i at 356-58, 328 P.3d at 365-67.

HRS § 378-2(a)(2) provides "[i]t shall be an unlawful discriminatory practice" for an employer "to discharge, expel, or otherwise discriminate against any individual because the individual has opposed any practice forbidden by this part or has filed a complaint, testified, or assisted in any proceeding respecting the discriminatory practices prohibited under this part[.]" HRS § 378-2(a)(2) (emphasis added).

In order to establish a prima facie retaliation claim, a

50

plaintiff must demonstrate,

> (a) the plaintiff (i) "has opposed any practice forbidden by HRS chapter 378, Employment Practices, Part I, Discriminatory Practices or (ii) has filed a complaint, testified, or assisted in any proceeding respecting the discriminatory practices prohibited under this part," (b) his or her "employer, labor organization, or employment agency has . . . discharged, expelled, or otherwise discriminated against the plaintiff," and (c) "a causal link has existed between the protected activity and the adverse action[.]"

Lales, 133 Hawaiʻi at 356, 328 P.3d at 365 (quoting Schefke, 96 Hawaiʻi at 426, 32 P.3d at 70).

If a plaintiff establishes a prima facie case of retaliation, "the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for the adverse employment action," and "if the defendant articulates such a reason, the burden shifts back to the plaintiff to show evidence demonstrating that the reason given by the defendant is pretextual." Id. at 356-57, 328 P.3d at 365-66 (quoting Schefke, 96 Hawaiʻi at 426, 32 P.3d at 70).

Gima's two complaints to the HCRC in 2016 qualify as protected activities under HRS § 378-2(a)(2) as does Gima's November 15, 2017 request for a reasonable accommodation. HRS § 378-2(a)(2); see e.g., Coons v. Sec'y of U.S. Dep't of Treasury, 383 F.3d 879, 887 (9th Cir. 2004) ("[Plaintiff] was engaged in a protected activity when he requested that [the employer] make reasonable accommodations for his alleged disability."). Gima filed a charge with the HCRC in March 2016 and a second charge

51

in November 2016.  She requested a reasonable accommodation on November 15, 2017.

There is no dispute that the trial court correctly concluded that Gima's April 2018 substandard performance evaluation and subsequent demotion qualified as adverse acts. See HRS § 378-2(a)(2); HAR § 12-46-189(a) ("[i]t is unlawful to . . . take an adverse action against any person because that person has . . . made a charge . . . to enforce any provision contained in this subchapter.").

Here, Gima established a genuine issue of material fact as to her superiors' knowledge of the 2016 HCRC charges and November 2017 request for a reasonable accommodation.  Takara's declaration attested that "Magota shared with [him] that Gima . . . launched a number of complaints and grievances against [Magota]" and Magota "was advised by his superiors and human resources to be careful if he submitted substandard performance rating[s] of . . . Gima[.]"  Additionally, the 2016 HCRC charges were sent to BFS with notice to BFS Director Koyanagi, who issued Gima's 2018 demotion letter.  As for Gima's reasonable accommodation request, Takara attested that he was "aware that Gima had requested that someone other than Magota supervise her[.]"  Further, the City filed a declaration from BFS employee Jennifer Bishop attesting that the Department of Human Resources sent a memo to BFS asking whether BFS could accommodate Gima's

request for an alternate supervisor, which BFS denied.

There is sufficient evidence in the record to infer a causal connection between Gima's protected activities and the City's adverse employment acts taken in 2018 that occurred after Gima filed her complaints in 2016 and after she submitted her reasonable accommodation request in 2017.  There is no per se rule as to a specific required time period to infer causation based on temporal proximity.  See Coszalter v. City of Salem, 320 F.3d 968, 977-78 (9th Cir. 2003).  We find the Ninth Circuit's reasoning persuasive and reject a "bright-line rule about the timing of retaliation" because "[a] rule that any period over a certain time is per se too long (or, conversely, a rule that any period under a certain time is per se short enough) would be unrealistically simplistic."  Id.  "Retaliation often follows quickly upon the act that offended the retaliator," Coszalter explained, "but this is not always so.  For a variety of reasons, some retaliators prefer to take their time[.]"  Id. at 978.  Sometimes "[t]hey may wait until they think the lapse of time disguises their true motivation.  Id. "We should be particularly sensitive to this last point, for if we establish a per se rule that a specified time period is too long to support an inference of retaliation, well-advised retaliators will simply wait until that period has passed" and then "retaliate with impunity."  Id.  Therefore, we look to the

"totality of the facts" to determine whether Gima established a prima facie case of retaliation.  See id.

While the adverse employment acts occurred approximately two years after Gima filed her March 2016 HCRC complaint and approximately fifteen months after Gima filed her November 2016 complaint, there is sufficient evidence in the record viewed in the light most favorable to Gima to establish a causal connection between the HCRC complaints and the adverse employment acts.  Gima's first substandard review in the record was issued in January 2017, which is two months after Gima filed her November 2016 HCRC charge, and ten months after she filed her March 2016 HCRC charge.

Further, it can be inferred from Gima's September 2017 review, which was issued by Magota, that Takara, who issued the April 2018 substandard review, had worked closely with both Magota and Gima prior to Gima's 2017 leave.  The September 2017 evaluation referred to Takara as the "superior" with whom Gima "became argumentative" and noted Gima's accusations against Takara asserting he was "being inappropriate" and "critical of [her]."  Gima was placed on workers' compensation leave shortly after receiving the September 2017 performance evaluation.  Less than three months after Gima returned to work, Takara issued Gima's 2018 substandard performance evaluation and her demotion

54

followed.

Similarly, with respect to Gima's request for a reasonable accommodation in November 2017, a fact-finder could reasonably infer that Gima's November 2017 request and the April 2018 negative evaluation and subsequent demotion were causally connected. Gima requested to be supervised by someone other than Magota on November 15, 2017. Less than six months after making her request, Gima was issued a substandard evaluation and was subsequently demoted. This occurred within the wider context of Gima having filed her prior complaints of discrimination with the HCRC. Further, her substandard review and demotion were issued within three months after her return from workers' compensation leave. Based on the totality of the circumstances and presented evidence, a reasonable fact-finder could infer that Gima's request for a new supervisor, which Takara attested he had knowledge of, was causally connected to her 2018 substandard review and subsequent demotion.

The City asserts that even if Gima established a prima facie retaliation case, there is no genuine issue of material fact as to whether the City's non-discriminatory reasons for the adverse employment acts were pretextual. An employee's job performance is considered a legitimate, non-discriminatory reason for an adverse employment action. Adams, 135 Hawaiʻi at 16, 346 P.3d at 85. The City contends Gima was demoted based on

55

her poor work performance citing to her substandard performance reviews issued in 2017 and 2018. The City's demotion letter asserted that Gima did not take "responsibility" or "ownership" of her tasks as a branch leader, and asserted that Gima's planning, supervision, job knowledge, quality and quantity of work, and reliability and initiative were substandard.

Because the City's proffered reasons for the adverse employment actions were purportedly related to Gima's performance at work, it can be construed that the City adequately met its burden of demonstrating a legitimate, non-discriminatory reason for Gima's 2018 substandard evaluation and subsequent demotion. The relevant question is whether Gima met her burden of demonstrating that the City's reasons for the adverse employment actions were pretextual. We hold that Gima has adequately demonstrated a genuine issue of material fact that the City's reasons for her substandard review and subsequent demotion were pretextual.

Similar to proving pretext in a discrimination claim, if an employer meets its burden of providing a "legitimate, nondiscriminatory reason" for the adverse employment action, the burden shifts to the employee to demonstrate that the employer's reasons were pretextual. Lales, 133 Hawai'i at 356-57, 328 P.3d at 365-66. In a retaliation claim, an employee can demonstrate pretext "either directly by persuading the court that a

discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Id. at 358, 328 P.3d at 367 (quoting Burdine, 450 U.S. at 256).

Gima established a genuine issue of material fact as to whether the performance reviews cited by the City were reliable and an accurate reflection of her actual performance at BFS. Gima's rebuttals to the individual performance reviews asserted that those reviews were "fabricated," she "lack[ed] proper oversight," the reviews "assign[ed] responsibility and blame" to her for her administrator's actions, and when she returned from leave in February 2018, "Takara did not make any effort to update [her] as to the status of any ongoing assignments or projects."

Further, there is sufficient evidence in the record for a fact-finder to infer that Magota's purported retaliatory animus was imputed to Takara based on a "cat's paw" theory with Takara acting as a conduit for Magota's retaliatory animus. See Adams, 135 Hawaiʻi at 47, 346 P.3d at 116 (Recktenwald, C.J., concurring and dissenting). A fact-finder could reasonably infer that Magota exhibited retaliatory animus towards Gima. Gima's 2016 HCRC charges alleged that Magota engaged in disability discrimination, retaliation, and sex discrimination against her, and all of the substandard performance reviews in the record

were issued after Gima filed these two 2016 HCRC charges, with Magota giving Gima three substandard reviews in 2017. In Takara's declaration, he attested that he discussed Gima's performance with Magota and was aware of her complaints against Magota. Takara also attested that Magota had "verbally explained to [him] that Gima's substandard performance was fully justified and felt her possible claims of retaliation or harassment held little weight[.]" Under these circumstances, a fact-finder could reasonably infer that Magota's purported retaliatory animus was imputed to Gima's April 2018 performance review given by Takara. Gima has demonstrated a genuine issue of material fact as to whether the reviews cited by the City as evidence of her performance at BFS were pretextual.

## VI. CONCLUSION

For the foregoing reasons, the circuit court's May 22, 2023 Findings of Fact, Conclusions of Law, and Order Granting Defendant City and County of Honolulu's Motion for Judgment on the Pleadings and/or Summary Judgment and June 5, 2023 Judgment are affirmed in part, and vacated in part. We affirm the court's granting of the City's motion for summary judgment on Gima's reasonable accommodation claim to the extent the court determined that the City engaged in an interactive process and provided Gima with a reasonable accommodation. We vacate as to Gima's disability discrimination and retaliation claims, and

remand the case to the circuit court for further proceedings consistent with this opinion.

| | |
|---|---|
| Joseph T. Rosenbaum, (Elizabeth Jubin Fujiwara, and Marcos R. Bendaña also on the briefs) for for plaintiff-appellant | /s/ Mark E. Recktenwald<br><br>/s/ Sabrina S. McKenna<br><br>/s/ Todd W. Eddins |
| Maria C. Cook (Nicolette Winter and William K. Awong also on the briefs) for defendant-appellee | /s/ Lisa M. Ginoza<br><br>/s/ Vladimir P. Devens |

